Filed 6/9/17 (opn. on remand from Supreme Court)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KIESHA RENEE SMITH et al.,<br><br>    Defendants and Appellants. | D069445<br><br><br><br>(Super. Ct. No. FSB1301449) |

APPEAL from judgments of the Superior Court of San Bernardino County, R. Glenn Yabuno, Judge.  Reversed in part and affirmed in part.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant Kiesha Renee Smith.

David M. McKinney, under appointment by the Court of Appeal, for Defendant and Appellant Michael Mitchell.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry J. Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendants Kiesha Renee Smith and Michael Mitchell appeal from their judgments of conviction for the murder of Josephine Kelley. In a prior opinion, we reversed both defendants' convictions due to prejudicial error in the joint trial before separate juries.[1] Thereafter, the People petitioned for review by the Supreme Court with respect to our reversal of defendant Mitchell's conviction on the grounds the trial court erred in admitting against Mitchell, as statements against interest, hearsay evidence of statements made by codefendant Smith in which she inculpated Mitchell in the murder. The Supreme Court granted review on this issue and transferred the case to our court for reconsideration in light of its recent decision in *People v. Grimes* (2016) 1 Cal.5th 698 (*Grimes*).

After reconsideration in light of *Grimes*, we find no error in the admission of evidence of statements Smith made which inculpate Mitchell. We also reject the other issues Mitchell raises on appeal. Accordingly, we once again reverse Smith's conviction but now affirm Mitchell's conviction.[2]

---

[1]     Although a joint trial was held, the defendants had separate juries. The evidence that the two juries heard differed in some respects.

[2]     In briefing submitted after the Supreme Court's remand of the case to this court, the parties agree that the Supreme Court's grant of review had no effect on the portion of our opinion regarding Smith's appeal.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. Factual background

1. *September 2005*

Josephine Kelley was 90 years old in 2005. She lived with her daughter Susan Hassett, her son-in-law Dennis Hassett, and her grandson Derrick Hassett.[3]

Derrick was unemployed. While living with his parents and grandmother, Derrick sold drugs and often accepted electronic devices and other goods as payment in exchange for drugs.

Sherry Beck used drugs, including marijuana and methamphetamine, and was one of Derrick's customers. She would sometimes pay Derrick money for the drugs, but other times would trade items, such as "cell phones, DVD players, different things," for drugs, and occasionally she used methamphetamine with Derrick.

2. *The day of the murder*

On September 15, 2005, Beck drove to Derrick's house and tried to trade a CD player or power tools for drugs. Derrick was in the garage of the home, and he and Beck met there. Derrick did not have any drugs to give Beck.

While Beck was talking to Derrick, Smith approached the house on foot and pretended to be looking for a lost kitten. According to Derrick, Beck and Smith "started arguing" about "their cat or something." At some point, while Beck was present, Derrick's friend Christopher Mahan showed up to "smoke . . . some dope" with Derrick.

---

[3]  We refer to the Hassetts by their first names when necessary for clarity.

3

Beck then left the Hassett home.

According to Mahan, Derrick and Mahan "smoke[d] . . . some dope" at the Hassett home; Derrick then "got all paranoid" and decided that they needed to leave the house. Derrick and Mahan went inside to close and check or lock all of the windows and doors. As they were leaving, Derrick said, " 'Bye grandma, love you.' "  Mahan heard no response.  The two then left to go to a store to get beer.  After they got some beer, Mahan dropped Derrick off at a friend's house near the Hassett home, and Mahan went back to work.

Susan Hassett returned home from work later that afternoon sometime after 3:30 p.m.  Upon entering her home, she saw "[her] mother's purse open, laying on the floor, and everything spread out around it from the contents of her purse."  Susan began to call out for her mother.  Susan immediately went to her mother's bedroom and found Kelley on her bed.  There was a pillowcase over Kelley's head.  Susan took the pillowcase off her mother's head, tried to wake her up and called 911.

3. *2005 Investigation*

A postmortem examination determined Kelley had died from homicidal asphyxia. Her legs and arms had been bound with wires used "for hooking up televisions, monitors or computer monitors."  The medical examiner testified that he "felt that the primary method or mode of asphyxiation here was smothering," but that "[t]he position she was in [i.e., the way 'she was lying'] might have contributed to her death."

Later in the evening of September 15, Mahan returned to the house where he had dropped Derrick off earlier; Derrick was still there, and Mahan told Derrick police were at Derrick's house.  Mahan had been contacted by police, and, at their request, he took

4

Derrick to the police station. In 2005, the investigation of Kelley's murder centered on Derrick.

Beck learned from the television news the following morning that Kelley had died and saw Derrick "in a[n] orange jumpsuit." Beck herself was interviewed by police a number of times, beginning shortly after Kelley's death. During her first interview, Beck told officers that she thought Smith might have been involved in Kelley's murder and that she was surprised Derrick was in custody. When Beck was interviewed about the crime by police investigators, she did not refer to Smith by name but instead referred to her as "Rhonda's daughter." Beck told a detective that she did not know Smith's name. Beck also said that she did not know Mitchell's name and that she only knew that he was Smith's boyfriend.

The District Attorney's office ultimately declined to prosecute Derrick for the crime. However, within a month after Kelley's death, police went to the home of Mitchell's mother, Theresa Johns, looking for Smith. Officers found Smith hiding in a closet. While at the residence, police found a number of items that had been taken from the Hassett residence. It also became clear that Smith and Mitchell had pawned, within days of the burglary, some, but not all, of the items of value that had been stolen from the Hassett residence. Many of the stolen items found in Johns's residence were identifiable as having been taken during the burglary of the Hassett residence, including jewelry and watches, some of which had personalized engravings. Police also found foreign currency and many coins, including coin collections.

Police searched a Chevy Blazer that was parked at Johns's house. Inside the Blazer, a detective found a small safe and a pink tackle box, which officers suspected

5

were also connected to the burglary of the Hassett residence. Inside the safe, an officer found collectible coin books containing collections of coins and currency from different countries; officers found jewelry and money inside the tackle box.

Mitchell was arrested and charged with receiving and possessing stolen goods; however, he was later released. When Mitchell was released in October 2005, he went back to his mother's home and brought with him police reports that had been provided to his attorney with respect to the stolen property charges he was facing.

Smith was held during the fall of 2005 on unrelated charges with or near another jail inmate, Amay Lott. At some point shortly after or near the time Smith was released from custody, Lott approached law enforcement officials and told them she overheard Smith and Smith's friend Kesha Williams talking. According to Lott, Smith told Williams she had been involved in a burglary during which someone had accidentally died.

4. *2013 Investigation*

As of 2013, Kelley's death remained "unsolved." However, in January 2013, a television news program broadcast a report about Kelley's death. Mitchell's mother, Theresa Johns, watched the program. As part of the news story, the police invited members of the community to come forward with any information they might have about the crime.

After viewing the news story, Johns contacted police with information she believed was relevant to the Kelley murder. Johns was interviewed twice by police investigators: the first time on January 10, 2013; and the second time on January 30, 2013. Johns told the investigators that, until she saw the news story, Johns had been

6

under the impression the victim's grandson had been arrested for her murder. Although police had not released to the general public the fact that Kelley had been found with a pillowcase over her head, Johns told police that she knew that Kelley had had a pillowcase placed over her head.

Johns told the police during the January 10, 2013 interview that she had overheard a conversation between Smith and Williams. The conversation occurred while Williams was not in custody and had been living with Johns. According to Johns, Smith told Williams that she and Mitchell had burglarized a home and that they had to subdue an elderly woman by tying her up. Further, Smith admitted that she and Mitchell had put a pillowcase on the woman's head, and Mitchell had hit the woman to get her to stop screaming.

During the January 30, 2013 interview, Johns said that before police searched her home in 2005, she heard Mitchell talking with Michael Spinks, Johns's common law husband, in the garage of Johns's home. According to Johns, Mitchell told Spinks "how he hit the lady and she didn't cry no more." He indicated that "Kiesha couldn't keep her quiet." According to Johns, after she heard Smith talking to Williams, she realized that Mitchell had been talking to Spinks about the same incident.

B. Trial court proceedings

1. *Pretrial proceedings*

Later in 2013, the San Bernardino County District Attorney filed an amended information charging Smith, Mitchell and Beck with one count of first degree murder.

7

(Pen. Code,[4] § 187, subd. (a); count 1.) The amended information also alleged two special circumstances: (1) that the murder was committed in the course of a robbery, within the meaning of section 190.2, subdivision (a)(17)(A); and (2) that the murder was committed in the course of a second degree burglary, within the meaning of section 190.2, subdivision (a)(17)(G).

Prior to trial, Beck withdrew her plea of not guilty and entered guilty pleas to multiple offenses, including voluntary manslaughter and elder abuse; pursuant to a negotiated plea agreement, Beck would receive a sentence of 17 years in state prison. Smith's and Mitchell's trials began on February 6, 2014; separate juries were empaneled for each defendant.

2. *Trial testimony*

a. <u>Beck</u>

At trial, Beck testified that, in September 2005, she was upset with Derrick. She believed that he had not been giving her quantities of drugs commensurate with the value of the items she was bringing him.

Beck, who had been convicted of burglarizing her own mother's home, spent time with other people who used drugs and stole things. Beck would sometimes pawn stolen items at pawn shops for other people. Beck knew Smith because they had lived in the same apartment complex, which was not far from the Hassett home. Beck sometimes gave Smith rides in Beck's car. One day in September 2005, Beck drove Smith and Mitchell to a pawn shop. As she, Smith and Mitchell drove by Derrick's house, Beck

---

4    Further statutory references are to the Penal Code unless otherwise indicated.

8

pointed out the Hassett residence to Mitchell and Smith and told them that they could probably acquire a lot of items from the home because Derrick was frequently getting items of value, such as electronics, in exchange for drugs. Shortly thereafter, Smith and Mitchell developed a plan in which Beck would go to the Hassett home and convince Derrick to leave so that Smith and Mitchell could burglarize it.

On September 15, 2005 Beck went to the Hassett home and did attempt to get Derrick to leave. After leaving the Hassett home, Beck saw Smith, Mitchell, and another man in a car. Beck told the occupants of the other car she did not want to have anything to do with burglarizing the Hassett home. Beck told Smith and Mitchell that Derrick's grandmother was at home and that she did not want them to burglarize the house. Smith and Mitchell did not say anything in response. Beck told Smith, Mitchell and the other man that she did not want any of the money or property that they might get from the Hassett house and that her only goal was to get even with Derrick. Beck then returned to the apartment complex where Smith lived. Although Beck was not living at the complex at that time, Beck still had friends there.

According to Beck, on the day after the burglary of the Hassett home, Smith, Mitchell and the other man who had been in the car with them the previous day approached Beck in front of the hotel where she was staying. They told Beck that she "needed to keep [her] mouth shut." They were in an SUV, and one of them had a weapon, which he pointed at Beck.

b. Johns

At trial, Johns recanted the statements that she had made during her interviews with detectives. She explained that, at the time she made the statements, she was angry

9

with Mitchell, and she knew what the investigators wanted to hear. Johns said that she had known certain details about the crime because she had access to police reports, which Mitchell had obtained when he was arrested for possessing stolen property from the Hassett home in 2005. Mitchell had left the police reports with Johns. Johns also said that she had researched the case on the internet.

On cross-examination, Johns conceded that she was not able to locate the documents she claims she saw in 2005. The prosecution also presented evidence that, in 2005, Smith and Mitchell were only being held for possible prosecution related to their possession of stolen property and that it was unlikely any law enforcement documents provided to them would have included details about Kelley's death.

c. <u>Williams</u>

Williams testified at trial. In September 2005, she was living with Johns in Rialto, California. Williams was present when police searched the house; however, she left immediately after the search to visit her mother in Texas.

Williams acknowledged that, after returning to Rialto, she got into a heated, and physical, confrontation with Johns, which resulted in Williams being arrested. Williams was in local custody for several days and was housed in the same area where Smith was incarcerated after being found with items stolen from the Hassett home. While Williams and Smith were in jail together, Williams overheard Smith tell others that she and her boyfriend had been robbing houses and that their last robbery "went bad."

Williams testified that she had been threatened in an attempt to discourage her from testifying against Mitchell and Smith. Although she did not feel that Smith had threatened her, Williams said that Smith had relayed threats from Johns. Williams

10

understood Johns to be "erratic" and "[d]estructive," and thought she would do "crazy things sometimes" and could be a "spiteful person."

However, Williams denied Smith told her details about the burglary of the Hassett home while at Johns's residence, as Johns had told investigators. According to Williams, if Johns asserted that she overheard such a conversation between Williams and Smith, that assertion would be false because Williams and Smith "never had a discussion" regarding a burglary that ended in a death. Williams testified that if she had learned such information, she would not have remained living in Johns's house.

d. Lott

Lott also testified at the 2014 trial. She testified that, when she was in jail with Smith in 2005, she had engaged in conversations with Smith, and that, during some of these conversations, Smith told Lott about a burglary in which an elderly woman had been in the home. According to Lott, Smith told her that the elderly woman was not supposed to have been at home, and Smith had told "them" to "just leave her alone" and said, "[L]et's go, let's go." But, "[t]hey put a pillowcase over her head, and the boys proceeded to beat her." Lott testified that Smith said "she was trying to get them to stop."

According to Lott, Smith said that they took coins, a "water bottle with coins," a safe, and jewelry from the residence. Lott admitted that she had been convicted of numerous crimes, including making a false financial statement, grand theft, perjury, possession of forged checks, commercial burglary, and receiving stolen property. Lott testified that she had not received any favorable treatment or other benefit as a result of coming forward with her statements against Smith.

11

e.  Mitchell

Smith did not testify at trial, but Mitchell did.  Mitchell said that, in 2005, he was selling drugs and living with his mother in Rialto.  Smith was his girlfriend and was living with him at his mother's house "off and on."  Other people also lived in the house at the time.

Mitchell did not discuss criminal activity with his mother.  However, after he was released from jail in 2005, she told him to stop whatever he was doing.

Mitchell explained that he met Beck through Smith.  Mitchell gave Beck drugs in exchange for property (as opposed to money) on one occasion.  Mitchell met Beck at his mother's house.  Beck brought a "big camping tent bag" that was "full of anything you can think of" to trade for drugs.  The bag had coins in it, including foreign currency coins.  Mitchell knew that the items were stolen property because he had "been selling drugs for a long time" and had learned that exchanging stolen items was "what most people do that wants drugs from a person like [him]."  In exchange for the items, Mitchell provided Beck with approximately $350 worth of drugs.

Mitchell testified that although he was aware that the items Beck had given him were stolen, he was unaware that the items had been taken from the scene of a homicide. If he had known this, he would not have taken the items, or he would have tried to sell them to someone else.  Mitchell admitted that he attempted to pawn some of the items that Beck had given him in exchange for drugs.

According to Mitchell, Smith was not involved in his drug transaction with Beck. Mitchell was the one who handled most of the items that Beck had given him, although he might have given Smith a bag "to go put . . . somewhere."  For the most part, he was

12

the one who had placed the items in different locations in his mother's house and in Smith's car.

Mitchell testified that sometime between 2005 and 2013, his mother had wanted custody of his children, and he had not been willing to agree to let her have the children. His relationship with his mother during that time period was "[l]ike cats and dogs. Sometimes we're cool, and sometimes we're like absolutely not at all." After Mitchell was arrested for Kelley's murder, Johns told him that she had gotten the story she told police "from [Mitchell's] old discovery."

Both juries found the defendants guilty of first degree murder and found true both of the special circumstance allegations.

The trial court sentenced both Smith and Mitchell to sentences of life in prison without the possibility of parole.

Both defendants filed timely notices of appeal.

As we indicated at the outset, after we issued our prior opinion in this case reversing both defendants' convictions, the Supreme Court granted the People's petition for review and transferred the matter to this court for reconsideration in light of *Grimes*, *supra*, 1 Cal.5th 698. At our request, the parties submitted further briefing with respect to the Supreme Court's transfer order.

## III.

## DISCUSSION

### A. Smith's appeal

Smith raises two contentions on appeal. She first argues that the trial court prejudicially erred in instructing her jury that *any* testimony from an accomplice requires

13

corroborating evidence before the jury may accept it as true. As Smith correctly notes, the actual rule is that a jury may not *convict* a defendant of an offense based on accomplice testimony without corroborating evidence. There is no corroboration requirement with respect to exculpatory accomplice testimony. According to Smith, because Mitchell provided testimony that tended to exculpate her, the court's instruction erroneously told the jury that there had to be evidence to corroborate his *exculpatory* testimony before the jury could accept it as true.

Smith's second contention is that the trial court prejudicially erred in discharging Juror No. 8 during the jury's deliberations. She asserts that no valid grounds for discharging this juror are apparent from the record, and further contends that the court's removal of this juror—the only juror who was leaning toward acquittal—violated her right to an impartial jury and to a unanimous verdict under the Sixth and Fourteenth Amendments.

    1. *The trial court's instruction on accomplice testimony prejudiced Smith*

Smith argues that the trial court erred in providing the jury with an instruction based on CALCRIM No. 301 that informed the jury that *any* accomplice testimony must be supported by corroborating evidence. We agree that the court's instruction was erroneous, and conclude that the error was prejudicial.[5]

---

[5]    The People maintain that Smith has forfeited this argument by failing to request a correction of the instruction that she challenges on appeal. The People note that a court is "not obliged to instruct on theories that lack substantial evidentiary support," and suggest that the trial court was not obliged to instruct the jury correctly with respect to accomplice testimony, because, the People argue, there was not substantial evidence of accomplice testimony that exonerated Smith. The People are incorrect with respect to the state of the evidence. Mitchell clearly provided testimony that tended to exonerate Smith (as we further address in part III.A.1.b.). The People's legal analysis is also incorrect.

14

a. The court provided an erroneous instruction regarding accomplice testimony

Section 1111 places a limitation on the use of "accomplice" testimony to convict a defendant: "*A conviction can not* [*sic*] *be had* upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Italics added.)

The trial court instructed Smith's jury with an instruction (Instruction No. 12), regarding the testimony of a single witness, which also commented on how the jury was to treat accomplice testimony: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence. However, the testimony of Sherry Beck, Amay Lott, and portions of Kesha Williams require supporting evidence. *The testimony of any other person you determine to be an accomplice also requires supporting evidence*." (Italics added.)[6]

Once the court determined that it would instruct the jury with respect to accomplice testimony, it was obligated to provide instructions that correctly stated the law. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1015 [court has a duty to give legally correct instructions].)

[6] The current standard instruction suffers from the same erroneous statement as the instruction given by the trial court in this case: "[Except for the testimony of _____ <insert witness's name>, which requires supporting evidence [if you decide (he/she) is an accomplice],] (the/The) testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully

15

The trial court also instructed the jury with an instruction based on CALCRIM No. 334, which informs the jury regarding how to decide whether a witness is an accomplice and, if the jury determines that the witness is an accomplice, instructs the jury that it may not use an accomplice's testimony to convict a defendant without some corroborating evidence. The court instructed Smith's jury as follows, in relevant part, based on CALCRIM No. 334 (Instruction No. 20): "Before you may consider the statement or testimony of Kiesha Smith, Michael Mitchell, Kesha Williams, Theresa Johns, Michael Spinks, Derrick Hassett or Christopher Mahan as evidence against the defendants Kiesha Smith or Michael Mitchell, you must decide whether Kiesha Smith, Michael Mitchell, Kesha Williams, Theresa Johns, Michael Spinks, Derrick Hassett or Christopher Mahan were an accomplices [*sic*] to those crimes.[7] A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if: [¶] 1. He or she personally committed the crime; [¶] OR [¶] 2. He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] 3. He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime; or participate in a criminal conspiracy to commit

_____

review all the evidence." (CALCRIM No. 301, boldface omitted.) The bench notes to this instruction provide: "The following constitutional provisions and statutes require evidence that corroborates a witness's testimony: Cal. Const., art. I, § 18 [treason]; Pen. Code, §§ 1111 [accomplice testimony]; 1111.5 [in-custody informant]; 653f [solicitation of felony]; 118 [perjury]; 1108 [abortion and seduction of minor]; 532 [obtaining property by false pretenses]. [¶] Give the bracketed phrase 'if you decide (he/she) is an accomplice' and CALCRIM No. 334 if the jury must determine whether a witness is an accomplice."

7    The instruction did not inform the jury of the "crimes" to which the phrase "those crimes" referred.

16

the crime. [¶] . . . [¶] If you decide that a declarant or witness was an accomplice, then you may not convict the defendant of felony murder based on his or her statement or testimony alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe; [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; [¶] AND [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crime. [¶] . . . [¶] Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

Since Mitchell was being prosecuted for the very same crime with which Smith was charged, he necessarily met the definition of an accomplice. At trial, Mitchell provided exculpatory testimony, not only as to himself, but also as to Smith—i.e., he provided testimony that was not properly subject to the rule requiring corroboration. Section 1111 provides in part that "[a] conviction can not [*sic*] be had upon the testimony of an accomplice unless it be corroborated." Exculpatory testimony, by definition, cannot be said to support a conviction and, thus, need *not* be corroborated.

Instruction No. 20 properly instructed the jury that it could "*not convict* the defendant of felony murder based on [an accomplice's] statement or testimony alone," but that such statements must be supported by independent corroborating evidence tending to connect the defendant to the crime. (Italics added.) However, the jury was given this instruction only after having been instructed with Instruction No. 12 that "[t]he testimony

17

of any other person you determine to be an accomplice also requires supporting evidence," without further explanation that this instruction applies only when such testimony is being used to determine a fact used to *convict* a defendant.

Instruction No. 12 was erroneous because it instructed the jury that if it determined that Mitchell was "subject to prosecution for the identical crime charged against [Smith]" then *all of Mitchell's testimony*, including the exculpatory testimony pertaining to Smith, required corroborating evidence before the jury could accept it as true. Instruction No. 12 improperly informed the jury that there must be corroborating evidence to support an accomplice's testimony that is either neutral or exonerating.

b. The instructional error was prejudicial

The People maintain that the trial court's instructions, including Instruction No. 12 and Instruction No. 20, were proper and correct, and suggest that this is so because Mitchell's testimony was not exculpatory as to Smith. Apparently convinced of the correctness of this position, the People provide no analysis with respect to the prejudice that may have resulted if the trial court's instructions were, in fact, erroneous. We therefore undertake a prejudice analysis without the benefit of the People's position.

Smith does not contend that the trial court's instructional error is subject to the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24, but rather that harmlessness review under the standard announced in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) is appropriate. We need not decide which standard of review applies because we conclude that even under the *Watson* standard, reversal is required.

"Under the *Watson* standard, prejudicial error is shown where ' " 'after an examination of the entire cause, including the evidence,' [the reviewing court] is of the

18

'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." [Citation.] "We have made clear that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." ' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

There is more than an abstract possibility that the instructional error affected the verdict in this case. The record demonstrates that Instruction No. 12 became a point of disagreement between a lone hold-out juror and the other 11 jurors, and that the hold-out juror was ultimately dismissed, in part because the other jurors believed that this juror was unwilling to follow the court's erroneous instruction regarding the need for corroboration of *any* accomplice testimony, regardless of whether that testimony was inculpatory or exculpatory.

First, contrary to the People's contention on appeal, it is clear that Mitchell's testimony *did* exculpate Smith. Mitchell testified that he obtained the items that were taken from the Hassett home when Beck exchanged those items with him for drugs. He further testified that Smith was not involved in the drug transaction with Beck, and specifically stated that Smith had not even really handled any of the items he had obtained from Beck, although he may have asked her to put an item or two somewhere for him. Although Mitchell acknowledged that he had been introduced to Beck through Smith, nothing about Mitchell's testimony expressly or implicitly implicated Smith in the burglary of the Hassett home, or in Kelley's death. Mitchell's testimony was exculpatory

19

as to himself and also had the effect of exculpating Smith.[8]

Smith's jury clearly considered whether it could accept Mitchell's testimony as true, without corroboration from an additional source. The jury began deliberating on April 2, 2014. During the first few days of deliberations, the jury requested read-backs of testimony, including Mitchell's. On April 8, 2014, in the afternoon, the foreperson sent a note to the judge indicating that she had concerns about one juror who she said had "repeatedly refused to deliberate further, to verbalize his doubt, and to follow some jury instructions." The foreperson's note indicated that the jurors were in agreement except for this one juror.

After receiving the note, the judge spoke with the foreperson on the record. The foreperson explained: "We've had — we've had a very intense several days. And we certainly have not had for days consensus except for one person. So we've — we've done, I think a lot of review of the evidence and really looking at the doubts that, you know, we might have about the situation. . . . [¶] So yesterday we began the process of determining kind of where we were. Okay. So we took an anonymous sample vote. And we had several people who were still undecided, and so we spent the rest of the morning deliberating and again talking over the evidence and reviewing the jury instructions. For example, regarding Michael Mitchell's testimony and if — that he, being considered an accomplice, there would need corroborating testimony. In order to use his testimony as,

---

8     The People suggest that Mitchell could not be viewed as an accomplice if his testimony exculpating himself was to be believed. However, the Penal Code defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) Mitchell was therefore, by definition, an accomplice since he was being prosecuted for the identical offense with which Smith was charged.

20

you know, as truth. So that was helpful in going back to the jury instructions to several people who were like, well, that's right actually. And it pulled things together for several of the other jurors. [¶] . . . [¶] You know, one thing [Juror No. 8] talks about a lot is Michael's testimony, which we've — I mean, hours we spent talking about Michael's testimony and how, because he is an accomplice, we would need corroborating evidence. And that got worked out for most people. And he said, 'Well, I'm not going to follow that. I don't think that is true and I'm not going to follow that.' I clarified with him, 'Let me reread this jury instruction. Are you saying that you are not going to follow that jury instruction?' And he said, 'Yep, I can't — can't do that.' "

The trial court then interviewed Juror No. 8, and inquired of him as to how the deliberations were going. Juror No. 8 told the court, "Well, you know, to finalize and make it easier, I, in good conscience — and it was argued that I wasn't listening to the law. And I said, 'No, I feel like I am.' So in good conscience the verdict that I picked, I can't change it. And we've rehashed it over and over. With all due respect to the court, I just cannot change it. I've done this, went over and over and kind of got heated. But I just said, 'No, I really do in good conscience believe what I believe. And so I don't know what else to say.' "

After asking Juror No. 8 a few more questions, the court said, "There was a concern that at least as to one jury instruction that you indicated that you couldn't follow that particular instruction."[9] Juror No. 8 replied that he had never said such a thing. The

---

[9]     There were five jury instructions that referenced accomplice testimony (Instruction Nos. 12, 20, 21, 41 & 42). Instruction Nos. 21 and 42 specifically referred to Sherry Beck being an accomplice if the jury made certain other findings, and then repeated the directions on the use of accomplice testimony provided in Instruction

court then asked whether Juror No. 8 knew which instruction the court was referring to, and Juror No. 8 responded, "It was just mentioned.  And I said that is not what I'm doing.  I believe I'm following the law."  The court then asked, "And in particular the instruction that we were apprised or I was just apprised of was the instruction regarding accomplice testimony requiring corroboration.  Has that been discussed?"  Juror No. 8 responded that it had been discussed several times, and he believed that he had expressed his opinion.

The following day, the court inquired of the other members of the jury.  Some, although not all, of the other jurors expressed a concern that at least one juror had indicated an unwillingness to "follow the law or the jury instructions."

For example, when asked whether Juror No. 8 had made any comment pertaining to the "instruction regarding accomplice testimony requiring corroboration," Juror No. 5 stated:  "He — he did believe one testimony of an accomplice.  However, when we were discussing and when we were trying to evaluate that testimony, we, as a jury, didn't find anything to corroborate that evidence.  However, Juror No. 8 still believed that that evidence was true regardless, that there was no corroborating evidence to prove that."

Upon inquiry from the court, other jurors made similar statements about the jury's

No. 20.  However, the court, foreperson, and other jurors never specified *which* instruction regarding accomplice testimony was being referenced during all of these discussions, and the court consistently spoke of a single jury instruction that Juror No. 8 was being accused of failing to follow.  As we have already pointed out, however, the instruction referring to accomplice testimony corroboration in Instruction No. 12 was in conflict with the instruction referring to accomplice testimony corroboration in Instruction No. 20 (and repeated in Instruction Nos. 21, 41 & 42), with respect to the requirement of corroboration for exculpatory accomplice testimony.

22

discussions regarding the instruction on accomplice testimony.[10]

The trial court eventually had a second discussion with Juror No. 8. During that discussion, the court again raised the issue of the "jury instruction [that] had to do with accomplice testimony requiring corroboration." Juror No. 8 again told the court that he believed that he was following the court's instruction, and that he felt as if he had "been cut off" by other jurors when he tried to express his views.

The trial court ultimately dismissed Juror No. 8, and provided two reasons for the dismissal: (1) that the juror failed to disclose a 1999 misdemeanor conviction in Riverside County, and (2) "that Juror No. 8, in his own opinion, is unable to continue as a juror in this case." The court also mentioned a possible third reason, i.e., "what the court perceives as a potential failure to properly deliberate." After the court replaced Juror No. 8 with an alternate juror, the jury unanimously convicted Smith of the charged offense, and found the special circumstances true.

The record demonstrates that the members of the jury, other than Juror No. 8, were applying the corroboration requirement to Mitchell's exculpatory testimony. This is made clear by the foreperson's comments, and is further supported by the comments

---

[10] The trial court and the jurors appear to have repeatedly assumed either that there was a single instruction regarding the need for corroboration of accomplice testimony, or that the instructions all said the same thing, when, in fact, the two most significant instructions provided by the court regarding accomplice testimony were not the same, and indeed, were in conflict with respect to whether exculpatory testimony of an accomplice had to be corroborated. In fact, the way that the court discussed the issue, by repeatedly referring to the instruction as a single one providing that accomplice testimony "requires" corroboration, suggests that the court was also under the misimpression that *all* accomplice testimony, and not only inculpatory accomplice testimony, required corroboration. As we have already explained, the law does not require that exculpatory accomplice testimony be corroborated.

23

made by a number of other jurors. Because Mitchell's testimony was clearly exculpatory as to Smith, no corroboration of his testimony was required if a juror wanted to accept his testimony as true, as Juror No. 8 apparently did. Yet Juror No. 8 was repeatedly told by other members of the jury that the instructions provided that the jurors could not accept that testimony as true without corroboration from another source. It is thus clear that the jury not only understood the trial court's instruction in Instruction No. 12 as requiring corroboration for any accomplice testimony, whether inculpatory or exculpatory, but that the jury believed that Mitchell fit the definition of an accomplice (a correct determination), and that his exculpatory testimony could not be believed because it was uncorroborated.

Juror No. 8 was attempting to apply the law correctly—i.e., to accept Mitchell's exculpatory testimony as true without requiring corroboration, and for this reason, was held out to the court by the other jurors as being unwilling to follow the court's instruction. It is clear from the record that the rift that emerged in the jury with respect to court's instructions pertaining to the requirement of corroboration of accomplice testimony is what ultimately led to Juror No. 8's dismissal from the jury, even if the reasons given for Juror No. 8's dismissal were not specifically that Juror No. 8 refused to apply the instructions provided by the court. Given this record, we can reach no conclusion other than that the trial court's erroneous instruction regarding the requirement that an accomplice's testimony be corroborated, irrespective of the nature of that testimony as inculpatory or exculpatory, affected Smith's verdict. In our view, it is at least reasonably probable that Smith would have obtained a more favorable result if the jury had not been erroneously instructed with respect to accomplice testimony. (See

24

*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1535 [a hung jury is considered more favorable than a guilty verdict].)

2. *Smith's other contention on appeal*

Because we reverse Smith's first degree murder conviction on the ground that the trial court's erroneous instruction concerning accomplice testimony prejudiced Smith, we need not address her additional contention that the trial court erred in discharging Juror No. 8 during deliberations.

B. Mitchell's appeal

1. *Admission of statements that Smith made to acquaintances*

Mitchell raises a number of legal claims challenging the trial court's admission of evidence regarding statements that Smith purportedly made to acquaintances, which inculpated both Smith and Mitchell in the burglary of the Hassett home and Kelley's murder. We disagree with Mitchell's contention that the admission of these statements violated his Sixth Amendment right to confront witnesses against him. We also conclude the evidence of Smith's statements were properly admitted against Mitchell as statements against her penal interest under Evidence Code section 1230.

a. The admission of the statements did not violate the confrontation clause because the statements are not testimonial

Mitchell's first challenge to the admission of hearsay evidence regarding Smith's statements to Williams, as overheard by Johns, and Smith's statements to Lott, is that the admission of these statements violated his right to confront witnesses because he was denied an opportunity to cross-examine Smith. This contention is without merit because the challenged statements are not testimonial. Mitchell's confrontation rights were

25

therefore not implicated by their admission.

Prior to the United States Supreme Court's decision in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the Court had interpreted the Sixth Amendment to permit the admission of out-of-court statements by an unavailable witness, as long as the statements bore "adequate 'indicia of reliability.' " (*Ohio v. Roberts* (1980) 448 U.S. 56, 66 (*Roberts*).) Such indicia existed if "the evidence falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." (*Ibid.*) In *Crawford*, the Court "adopted a different approach" to the Sixth Amendment's concerns. (*Ohio v. Clark* (2015) ___ U.S. ___ [135 S.Ct. 2173, 2179] (*Clark*).) The *Crawford* opinion "explained that 'witnesses,' under the Confrontation Clause, are those 'who bear testimony,' and . . . defined 'testimony' as 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " (*Clark*, at p. 2179, quoting *Crawford*, at p. 51.)

*Crawford* held that the Sixth Amendment "prohibits the introduction of *testimonial* statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " (*Clark*, *supra*, 135 S.Ct. at p. 2179, quoting *Crawford*, *supra*, 541 U.S. at p. 54, italics added.)

United States Supreme Court decisions after *Crawford* have attempted to explain what types of statements are "testimonial" for purposes of the Sixth Amendment, since *Crawford* "did not offer an exhaustive definition of 'testimonial' statements." (*Clark*, *supra*, 135 S.Ct. at p. 2179.) For example, in *Davis v. Washington* (*Davis*) and *Hammon v. Indiana* (*Hammon*) (2006) 547 U.S. 813, which were decided together, the Court considered statements given to law enforcement officers. The victim in *Davis* made

26

statements to a 911 emergency operator during and immediately after an attack. (*Id.* at pp. 817-819.) In *Hammon*, after the victim was isolated from her abusive husband, she made statements to police that were memorialized in something called a " 'battery affidavit.' " (*Id.* at pp. 819-820.) The United States Supreme Court held that the statements at issue in *Hammon* were testimonial, but that the statements at issue in *Davis* were not. The court offered the following test for determining whether a statement is testimonial: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822.) However, because both *Hammon* and *Davis* involved statements made to law enforcement officers, the Court reserved the question whether similar statements to individuals *other* than law enforcement officers would raise issues under the Confrontation Clause. (*Id.* at p. 823, fn. 2.)

In 2011, the United States Supreme Court further elucidated the "primary purpose" test, explaining that a court must consider "all of the relevant circumstances." (*Michigan v. Bryant* (2011) 562 U.S. 344, 369.) Specifically, "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." (*Id.* at p. 358.) "[T]he existence *vel non* of an ongoing emergency is *not* the touchstone of the testimonial inquiry." (*Id.* at p. 374, first italics in original, second italics added.) Instead, "whether

27

an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." (*Id.* at p. 366.) Another factor a court is to consider is "the informality of the situation and the interrogation." (*Id.* at p. 377.) "A 'formal station-house interrogation,' like the questioning in *Crawford*, is more likely to provoke testimonial statements, while less formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." (*Clark*, *supra*, 135 S.Ct. at p. 2180.) Another factor a court is to consider is *to whom* the statements were made. Although the United States Supreme Court has declined to adopt a categorical rule excluding statements made to individuals who are not law enforcement officers from the Sixth Amendment's reach, the Court has noted that "such statements are much less likely to be testimonial than statements to law enforcement officers." (*Id.* at p. 2181.)

Ultimately, the question that a court must answer in determining whether a statement falls within the ambit of the Confrontation Clause is whether, in light of all the circumstances and when viewed objectively, "the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " (*Clark*, *supra*, 135 S.Ct. at p. 2180.)[11]

Given the circumstances surrounding the statements at issue, the statements are

---

[11]    We reject Mitchell's contention, based on *Lilly v. Virginia* (1999) 527 U.S. 116 (*Lilly*), that the Sixth Amendment "appear[s] to come into play even where hearsay evidence is viewed as non-testimonial." *Lilly* relied on *Roberts*, *supra*, 448 U.S. 56 for its holding, but *Roberts* was effectively overruled in *Crawford*, *supra*, 541 U.S. at page 51. Thus, as courts have repeatedly expressed, "[o]nly the admission of testimonial hearsay statements violates the confrontation clause." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812.)

not "testimonial" under the "primary purpose" test. The challenged statements are alleged to have been made to acquaintances, not to law enforcement officers. They were not made during an interrogation, and there is not a single circumstance that would lead one to conclude that the conversations occurred to establish past events for the purpose of a future criminal prosecution. Any conversations that Smith had with either Williams (as overheard by Johns) or Lott were not had for the primary purpose of creating an out-of-court substitute for testimony. We therefore conclude that Mitchell's claim that his right to confront witnesses was violated by the admission of these statements is without merit. However, that does not end our inquiry. We must also consider whether the statements were properly admitted under the hearsay exception for statements against the declarant's interest.

b. The evidence of Smith's statements was properly admitted under the hearsay exception for statements against penal interest

Mitchell's second challenge to the admission of hearsay evidence of Smith's statements to Williams and Lott is that the statements do not qualify as statements against interest and, therefore, were not admissible against him under Evidence Code 1230. In particular, he contends that Smith's statements were not inculpatory because they tend to cast more responsibility for Kelley's death on him than on her.

i. *Grimes*

Because we have been directed to reconsider our opinion in light of *Grimes*, we begin there.

In *Grimes*, a death penalty case, the defendant was charged with participating in the burglary, robbery and murder of a 98-year-old victim who was found in her home

29

with blunt force trauma to her head, ligature strangulation and stab wounds. The actual killer was apprehended shortly after the murder and committed suicide before trial. The defendant offered, as statements against penal interest, statements the killer made to third parties before and after his apprehension in which he stated that the defendant and another participant in the burglary had not taken part in the killing; according to the defendant's offer of proof, the killer told one of the third parties that, after he killed the victim, the other two looked at him " 'as if they were saying, what in the hell are you doing, dude.' " (*Grimes*, *supra*, 1 Cal.5th at p. 710.) The trial court excluded the exculpatory portions of the third party statements because it concluded that they were not declarations against the killer's interest.

On direct appeal, the Supreme Court found that the statements did qualify as declarations against interest. However, the Supreme Court found that the failure to admit the statements did not prejudice the guilty verdict or the jury's finding of a special circumstance; rather, the court found the error only prejudiced the jury's separate verdict of death.

In finding the statements should have been admitted, the court stated: "[T]he nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' " (*Grimes*, *supra*, 1 Cal.5th at

30

p. 716.) Importantly, the court found that a statement is not "automatically inadmissible merely because it does not render the declarant more culpable than the other portions of his confession—or because, as the trial court put it in this case, the statement does not 'significantly enhance the personal detriment' to a person who has already confessed responsibility for the crime." (*Id*. at p. 717.)

The court recognized, "[a] rule that permitted admission of no more of a declarant's statement than was necessary to expose him to criminal liability, requiring courts to mechanically sever and excise the rest, certainly might be easier to apply. But as the concurring and dissenting opinion itself appears to recognize, this is not the rule we have: Under the law as it has developed in California, as in the federal system, context matters in determining whether a statement or portion thereof is admissible under the against-interest exception. This contextual approach accords with the rationales underlying the modern expansion of the rule governing the admission of statements against interest." (*Grimes*, *supra*, 1 Cal.5th at p. 717.) *Grimes* instructs that courts may consider whether the portion of a confession that tends to exculpate the declarant nonetheless may be admitted "in view of surrounding circumstances, even though the exculpatory portion of the statement is not independently disserving of the declarant's interests." (*Id.* at p. 715.)

The opinion in *Grimes* was subject to a concurring and dissenting opinion prepared by the Chief Justice and joined by two of her colleagues. The concurring and dissenting opinion argued that the portion of the killer's statements that exculpated the defendant were entirely collateral to the portions that inculpated the killer and, as a matter of logic, could easily be separated from the remainder of his statements. "Unlike

31

situations in which a contextual fact is 'inextricably tied to and part of' a specifically disserving statement [citation], in which case stripping the contextual fact would require alteration of the incriminating statement itself, [the killer's] statement describing the looks he received was readily separable from his admissions that he had strangled and stabbed the victim. It takes no great leap of imagination to appreciate how [the witness] could have testified fully and coherently to [the killer's] statements about strangling and stabbing [the victim] without also testifying to [the killer's] collateral statement about the looks he received from defendant . . . afterward." (*Grimes*, *supra*, 1 Cal.5th at p. 744 (conc. & dis. opn. of Cantil-Sakauye, C.J.).) Because the arguably exculpating portions were collateral and did not disserve the killer's interest, the Chief Justice found that they were not admissible under Evidence Code section 1230. (*Id.* at pp. 744-745.)

　　ii. *Samuels, Gordon, Wilson, and Greenberger*

　　On the very issue presented here—the admission of statements that cast the defendant in a harsher light than the declarant—it is of some import that in *Grimes*, both the majority opinion and the Chief Justice's concurring and dissenting opinion, cited with approval the court's prior opinion in *People v. Samuels* (2005) 36 Cal.4th 96 (*Samuels*). (See *Grimes*, *supra*, 1 Cal.5th at p. 716; see also *Grimes*, at p. 744 (conc. & dis. opn. of Cantil-Sakauye, C.J.).)

　　In *Samuels*, a paid murderer told his friend that he had killed the victim, that the defendant had paid him and that he had paid some of the money to a third person who helped him. The court rejected the defendant's contention that those portions of the murderer's statements that implicated her were collateral and did not directly disserve the murderer's interest. The court stated: "Under the totality of the circumstances presented

32

here, we do not regard the reference to defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the friend's] recollection of [the murderer's] precise comments to him. *Instead, the reference was inextricably tied to and part of a specific statement against penal interest.*" (*Samuels, supra*, 36 Cal.4th at p. 121, italics added.)

Thus, the contextual approach set forth in *Samuels* and reiterated in *Grimes* does not permit a mechanical analysis of statements offered under Evidence Code section 1230. This approach is not by any means novel. In *People v. Gordon* (1990) 50 Cal.3d 1223 (*Gordon*), the Supreme Court considered statements made by an accessory, Rauch, who told law enforcement officers that he had provided the defendant, his nephew, with shelter and medical care *after* the defendant had been wounded in a robbery. Although the statement minimized the declarant uncle's role and portrayed his nephew in a much harsher light, the court found the statement admissible: "The court could have reasonably concluded that at the time it was made, Rauch's statement so far subjected him to the risk of criminal liability that a reasonable person in his position would not have made it unless he believed it to be true. This is because Rauch all but confessed that he was an accessory to the crimes committed in the Riverside K mart incident . . . . To be sure, Rauch did not *expressly* admit either intent or knowledge. But he impliedly admitted both by his suspicious conduct throughout the incident in question. [¶] Defendant argues to the contrary. He claims Rauch's statement should be considered untrustworthy in view of its substance. He says it must be characterized as neutral or exculpatory, and therefore unreliable, because it admits no more than it does. We cannot so characterize the statement. To be sure, *the criminal liability that the statement risks is not the highest.*

33

*But it is significant nonetheless*." (*Id.* at p. 1252, second italics added.)

The court in *People v. Wilson* (1993) 17 Cal.App.4th 271 (*Wilson*) relied on *Gordon*. In *Wilson*, the defendant was convicted of two counts of attempted voluntary manslaughter based, in part, on statements his wife made to police in which she stated that, following the attempted homicides, her husband instructed her to retrieve from a tree near their residence the gun he had used in the attempted homicides and take it to her mother's house; the wife further stated she had done as instructed. Although the statement implicated the defendant in a far more serious offense, the court found the statement specifically disserved the wife's interest because it showed she was an accessory to the offense as defined by section 32. (*Wilson*, at pp. 275–277.) "The fact that the statement is also disserving to [the nondeclarant] does not render the statement unreliable and inadmissible." (*Id*. at p. 276.)

The court reached a similar result in *People v. Greenberger* (1997) 58 Cal.App.4th 298 (*Greenberger*). In *Greenberger*, a declarant had been the driver in a kidnapping and murder for hire in which his codefendant had been a principal actor. Although the declarant's statements described his role as only the driver and smaller than his codefendant's, the statements were nonetheless sufficiently disserving of the declarant's penal interest that "a reasonable person in [the declarant's] position would not have made them unless he believed them to be true." (*Id.* at p. 337.)

iii. *Trustworthiness*

While statements that are specifically a disservice to the declarant may be admitted, the statements must *also* be made under circumstances that demonstrate they are trustworthy. (See *People v. Duarte* (2000) 24 Cal.4th 603, 612-614 (*Duarte*); see also

34

*Greenberger*, *supra*, 58 Cal.App.4th at p. 337.) Stated another way, even when statements are disserving to the declarant, they may still be excluded if nonetheless they have been made under circumstances that undermine their reliability. This requirement arises as a means of satisfying the confrontation clause of the Sixth Amendment to the United States Constitution. (See *Greenberger*, at pp. 334-332; see also *Wilson*, *supra*, 17 Cal.App.4th at p. 277.) In determining trustworthiness, "the trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*Greenberger*, at p. 334.) The least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. " 'Once partners in crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.' [Citation.] However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Id.* at p. 335.)

In *Greenberger*, even though the driver/declarant's statement minimized his own role and attributed to his codefendant a murder in which other defendants shot the victim 13 times, because the statements were made in an informal setting in which the driver/declarant had been drinking with an undercover police informant, the court found that the "circumstances of the conversation provided sufficient indicia of reliability to ensure that the statements were trustworthy." (*Greenberger, supra*, 58 Cal.App.4th at p. 337.)

The cases that have considered Evidence Code section 1230 make it clear that the fact a hearsay statement portrays the declarant as a more minimal participant in a crime by itself does not require exclusion or end our analysis. The statements at issue in *Gordon*, *Wilson* and *Greenberger* each portrayed a defendant as far more culpable than the respective declarants; nonetheless, in each instance, the trial court concluded the statements both specifically disserved the declarant's interest and were made under circumstances that suggested they were reliable, and, in each instance, the trial court's determination was upheld. (See *Gordon*, *supra*, 50 Cal.3d at pp. 1252-1253; *Greenberger*, *supra*, 58 Cal.App.4th at p. 337; *Wilson*, *supra*, 17 Cal.App.4th at pp. 276-277.) Only when there is both blame shifting by the declarant and *other* circumstances suggest some improper motive for the blame shifting have courts found admission of a hearsay statement error. (See *Duarte*, *supra*, 24 Cal.4th at pp. 612-614.)

iv. *Application*

The statements Smith made to Williams, which Johns told police she overheard, clearly disserved Smith's penal interest. The statements put her at the scene of a burglary, robbery and murder. In particular, the references Smith made to Mitchell in the statement plainly disserved her penal interest because they showed she was not only at the scene of the crimes, but that she was there to assist Mitchell and was willing to follow his directions. Given the facts that Smith related in Johns's presence, although they portrayed her as the more passive participant, they disserved her penal interest in a manner indistinguishable from the statements considered in *Gordon*, *Wilson* and *Greenberger*. In those cases, as here, the declarants' respective inculpatory statements about themselves were inextricably intertwined with statements that placed more

36

responsibility on the nondeclarant defendants and were, therefore, nonetheless admissible.

In this regard, we note Smith's statement in Johns's presence meets even the stricter standard adopted by the dissenters in *Grimes.* In implicating Mitchell in Kelley's death, Smith necessarily placed herself at the scene of the burglary and homicide and, consequently, implicated herself in the murder as well. Thus, unlike the circumstances discussed in *Grimes*, here there is no credible basis upon which to argue that Smith's statements were in any sense collateral. Rather, as in *Gordon*, *Wilson* and *Greenberger*, those portions of Smith's statements that implicated her in the murder were inextricably intertwined with the portions that implicated Mitchell. There was simply no way in which her statements about being at the scene of the burglary, robbery and murder in which she was a relatively lesser participant would make any sense without reference to the major actors and, in particular, her boyfriend.

Admittedly, the reliability of the statements Johns overheard is worthy of careful analysis. Looking only at the version Johns initially provided police, the circumstances of Smith's statements give the statements a great deal of reliability. The statements were informal and made in the presence of friends in a setting in which there was no apparent reason to dissemble or exaggerate.

The circumstances—which, of course, call Johns's initial version of Smith's statements into question—are Johns's later recantation and Williams's contradiction of Johns's initial version. Here, we must rely on the trial court's resolution of this evidentiary conflict. At the time the police took the statement from Johns, it had very powerful indicia of reliability: The statement implicated Johns's son in a homicide, Johns

37

provided the statement in apparent spontaneous reaction to a news story, and the statement included details that the police had not previously disclosed. The trial court, and eventually the jury, could easily discount Johns's later recantation as motivated by her reconsideration of the seriousness of her son's situation and Williams's memory of one conversation about the crime and not another to both passage of time and animosity toward Johns. In short, on this record, while a finding that Johns's initial version was unreliable would certainly have been rational, so was the trial court's finding of reliability.

The circumstances here are in marked contrast to the statements considered in *Duarte*. There, the declarant, was being questioned by police and made statements about the defendant that did not directly inculpate the declarant. Statements that did not disserve the declarant and were made in a context in which the declarant had obvious motives to shift blame to the nondeclarant do not fall within Evidence Code section 1230. However, because the record in *Duarte* is so different from the record here, it does not, in any sense, undermine the trial court's admission of evidence of statements made in Johns's presence.

Like the statements Johns overheard, the statements Smith made to Lott herself were plainly disserving to Smith's interest. Again, they put Smith at the scene of the burglary, robbery and murder, helping Mitchell. The fact that, in the statements, Smith describes her attempts to dissuade Mitchell and a third person from putting a bag over Kelley's head and beating her does not make the references to Mitchell less reliable or inadmissible; the portions that make Mitchell more aggressive were, like the statements Johns heard, inextricably intertwined with the fact that, in admitting that she witnessed

38

the crime and helped the other perpetrators, Smith was inculpating herself. (See *Samuels*, *supra*, 36 Cal.4th at p. 121.) As in *Greenberger*, a reasonable person in Smith's position would not have made the statements unless she believed them to be true. (See *Greenberger*, *supra*, 58 Cal.App.4th at p. 337.)

When Lott heard Smith's statements, Lott was in no position to either coerce Smith or reward her for divulging information about herself or Mitchell. In that context, Smith had no very real motive to exaggerate Mitchell's role in the burglary and murder. Also, there does not appear to be anything in the record that suggests Lott had any motive for inventing the statement or embellishing it in a manner in which Mitchell's role in the crime was amplified.

Thus, as in the case of the statements Johns overheard, there is no basis on which to find the trial court abused its discretion in admitting Lott's testimony in which she related her recollection of Smith's statements.

v. *Prejudice*

Although the trial court did not abuse its discretion in admitting Smith's statements, even if there was an abuse of discretion, reversal of Mitchell's conviction would not be warranted.

In this regard, the court's discussion of prejudice in *Grimes* is particularly telling. Even though the court in *Grimes* found that it was error to exclude the killer's statement, with respect to the jury's finding the defendant acted with reckless indifference to human life and was therefore eligible for the death penalty, the court found that the error was not prejudicial.

Although the defendant conceded that the statements would not have had any

39

impact on the jury's verdict of guilt, he argued it did affect the jury's special circumstance finding. The court reviewed the special circumstance finding under the familiar standard set forth in *Watson*, *supra*, 46 Cal.2d at page 836 and found that, in light of the entire record, no reasonable jury could have determined that he was not a major participant who acted with reckless indifference, particularly in light of the fact there was no dispute he handed the killer a gun and heard the killer express his intention to kill the victim. (*Grimes*, *supra*, 1 Cal.5th at p. 721.) However, with respect to the jury's verdict of death, the court applied a higher standard of prejudice, akin to the one used when there has been an error that violates the federal Constitution. (*Id*. at p. 722.) Under that standard, the court found that there was a possibility the jury might have reached a different verdict and, accordingly, reversed and remanded for a new penalty phase trial. (*Id*. at p. 723.)

Here, there is no dispute Kelley died at the hands of another. Moreover, there is no dispute that Smith and Mitchell pawned items taken from Kelley's house and that other items taken from the home were found at Johns's home, where Mitchell resided. These facts alone raise a reasonable inference that Smith and Mitchell participated in the burglary, robbery and murder. Moreover, there was evidence of what occurred in the Hassett home: When Derrick and Mahan left the home, they locked it up, and Mahan recalled Derrick saying good-bye to his grandmother; when Susan came home, her mother's belongings were strewn around the house, and she found Kelley bound and gagged. Most importantly, Beck's testimony plainly implicated both Smith and Mitchell and exculpated Derrick. Beck was going to be serving a substantial term of imprisonment for her role in Kelly's death and would not have any particular reason to falsely accuse Smith and Mitchell rather than Derrick. Under these circumstances, even

40

in the absence of Smith's statements, a jury was more likely than not to have rejected Mitchell's version of events, in which Derrick was the likely killer of his grandmother, and found Mitchell responsible. No more is required under *Watson*.

2. *Mitchell's other claims of error*

a. Adoptive admission instruction

Mitchell contends the trial court erred in failing to sua sponte instruct the jury that Derrick Hassett's silence in the face of statements made to him by Mahan could have been construed as an adoptive admission and, in the alternative, that his trial counsel was ineffective in failing to request such an instruction.

On the evening of Kelley's murder, when Mahan picked up Derrick at the house where Mahan had left Derrick earlier in the day, Derrick was "stoned" and nearly incoherent; according to Mahan, Derrick was not very responsive to him and, in fact, said nothing when Mahan told him his grandmother had been murdered and that Derrick was likely to go to prison. Contrary to Mitchell's argument on appeal, these circumstances did not give rise to any obligation to sua sponte instruct the jury on adoptive admissions or support a claim of ineffective assistance of counsel.

In *People v. Carter* (2003) 30 Cal.4th 1166, 1197-1198, the court expressly held that, in the absence of a request from the defendant, a trial court should *not* give CALJIC No. 2.71.5,[12] which instructs the jury with respect to adoptive admissions. "The

_____

[12] CALJIC No. 2.71.5 states: "If you should find from the evidence that there was an occasion when [a] [the] defendant (1) under conditions which reasonably afforded [him] [her] an opportunity to reply; (2) [failed to make a denial] [or] [made false, evasive or contradictory statements,] in the face of an accusation, expressed directly to [him] [her] or in [his] [her] presence, charging [him] [her] with the crime for which this defendant now is on trial or tending to connect [him] [her] with its commission; and (3) that [he]

41

instruction is largely a matter of common sense—silence in the face of an accusation is meaningful, and hence may be considered, only when the defendant has heard and understood the accusation and had an opportunity to reply. Giving the instruction might cause the jury to place undue significance on bits of testimony that the defendant would prefer it not examine so closely." (*Carter*, at p. 1198.) Thus, the trial court plainly had no sua sponte duty to give CALJIC No. 2.71.5.

Moreover, counsel's failure to request CALJIC No. 2.71.5, will not support a claim of ineffective assistance of counsel. In light of Mahan's description of Derrick's fairly severe intoxication at the time he confronted him, counsel may have simply believed that it was unlikely the jury would interpret Derrick's intoxicated silence as an admission and, for that reason, did not believe it was worth emphasizing with CALJIC No. 2.71.5; counsel may instead have wanted to focus the jury on the undisputed evidence Derrick dealt in both drugs and electronic goods. We are in no position to question what appear to be counsel's tactical choices. (See *People v. Lopez* (2008) 42 Cal.4th 960, 966.)

b. Beck's plea agreement

Mitchell also contends the trial court erred in admitting evidence that under the terms of her plea agreement, Beck was required to testify truthfully; that following the trial, the trial court would determine if Beck had done so; and that, if Beck had not been

[she] heard the accusation and understood its nature, then the circumstance of [his] [her] [silence] [and] [conduct] on that occasion may be considered against [him] [her] as indicating an admission that the accusation was true. Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the [silence] [and] [conduct] of the accused in the face of it. Unless you find that [a] [the] defendant's [silence] [and] [conduct] at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement."

truthful, she would not be given the benefit of her plea agreement and would face prosecution for her part in Kelley's murder.

There is nothing improper in a plea agreement that requires an accomplice to testify truthfully. (*People v. Gurule* (2002) 28 Cal.4th 557, 616-617.) Moreover, there is nothing improper in advising a jury that one condition of a plea agreement is that the accomplice must testify truthfully and that the plea agreement will not be honored if he or she does not. (*People v. Bonilla* (2007) 41 Cal.4th 313, 335.) This is not a case where the plea agreement either required that an accomplice testify in a certain substantive manner (see *People v. Allen* (2002) 28 Cal.4th 557, 615) or the prosecutor in any manner vouched for the credibility of the accomplice based on information *outside* the record (see *Bonilla*, at p. 337, fn. 9).

In sum, admission of evidence that Beck's plea agreement included a requirement that Beck testify truthfully was not erroneous.

c. Impeachment of Lott

Next, Mitchell argues that because, contrary to Lott's testimony, there was documentary evidence which showed that Lott did not share a cell with Smith in 2005, Mitchell's counsel was ineffective because he did not raise the issue in his argument to the jury.

"The decision of how to argue to the jury after presentation of evidence is inherently tactical." (*People v. Freeman* (1994) 8 Cal.4th 450, 498.) Here, Mitchell's counsel, rather than attacking Lott's credibility with respect to a collateral matter that occurred years earlier, chose to emphasize Lott's criminal record, including her perjury convictions. Such a tactical choice will not support a claim of ineffective assistance of

43

counsel.  (*Ibid.*)[13]

> d.  Cumulative error

Having found no error, we find no cumulative error that prejudiced Mitchell.

IV.

DISPOSITION

The judgment against Smith is reversed and remanded to the trial court for retrial; the judgment against Mitchell is affirmed.

BENKE, J.

I CONCUR:

McCONNELL, P. J.[14]

---

[13]  Parenthetically, we note Smith's counsel did discuss the discrepancy between the jail records and Lott's recollection that she shared a cell with Smith, and Smith's jury nonetheless convicted Smith.  This circumstance, of course, undermines Mitchell's contention that his counsel's argument prejudiced him.

[14]  After this court filed its original opinion in this matter and before the Supreme Court transferred the cause back to this court, Justice Alex McDonald, who concurred in our initial disposition of Smith and Mitchell's appeals, died.  Presiding Justice Judith McConnell has been assigned to replace Justice McDonald as a panel member in this case.

44

AARON, J.

I concur in the majority opinion with respect to the reversal of Defendant Smith's convictions. However, I disagree with the majority's conclusion that statements purportedly made by Smith in which she placed the majority of the blame for the murder of the victim on Mitchell were properly admitted against Mitchell as statements against Smith's penal interest.

As our Supreme Court recently noted in *People v. Grimes* (2016) 1 Cal.5th 698, 713 (*Grimes*), the United States Supreme Court has held that the analogous federal hearsay exception for statements against penal interest *does not* authorize the admission of those portions of a third party's out of court statement that tend to shift the blame to the defendant. (*Id.* at pp. 713–714, citing *Williamson v. United States* (1994) 512 U.S. 594 (*Williamson*).) "Where . . . 'part of the confession is actually self-exculpatory, the generalization on which [the hearsay exception] is founded becomes even less applicable. Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements.' " (*Grimes*, *supra*, at p. 714.)

The hearsay statements attributed to Smith clearly shift the majority of the blame to Mitchell and another unidentified man and thus have a "net exculpatory effect." (*People v. Duarte* (2000) 24 Cal.4th 603, 612 (*Duarte*).) It was therefore error, in my view, to admit the statements against Mitchell as declarations against Smith's interest. I would conclude that the admission of these statements prejudiced Mitchell.

*Statements in which the Declarant Places the Majority of the Blame on Others
are not Admissible Under the Exception for Declarations Against Interest*

In the seminal case of *People v. Leach* (1975) 15 Cal.3d 419, 441 (*Leach*), the Supreme Court first announced the rule that Evidence Code section 1230 is "inapplicable to evidence of any statement or portion of a statement not itself *specifically disserving* to the interests of the declarant." (Fn. omitted, italics added.) In *Leach*, several defendants were charged with conspiracy to commit murder. Prior to trial, some of the defendants made statements describing the conspiracy, in which they inculpated themselves and other defendants. (*Leach*, at pp. 438–442.) The Supreme Court concluded that the exception for admissions against penal interest did not apply to "evidence of any statement or portion of a statement not itself *specifically disserving* to the interests of the declarant," and thus, that the statements had been improperly admitted at trial. (*Id.* at pp. 441–442, fn. omitted, italics added.) In reaching this conclusion, the *Leach* court "explained that those portions of a confession inculpating others are not as inherently trustworthy as those portions that are actually disserving to the declarant's interests." (*Grimes*, *supra*, 1 Cal.5th at p. 713.) The *Leach* court further noted that " '[t]his limitation on the against-interest exception was at least implicit' in decisions of this court and of the United States Supreme Court that generally forbid the prosecution in a joint trial of two defendants from introducing those portions of one defendant's confession that implicate the other defendant." (*Ibid.*, quoting in part *Leach*, at p. 441.)

More recently, in *Duarte*, the defendant and another man were charged with shooting at a dwelling. (*Duarte*, *supra*, 24 Cal.4th at pp. 607–609.) Prior to the

defendant's trial, the other man gave police a statement in which he acknowledged his participation in the crime but minimized his role in it, and implicitly placed greater blame on the defendant. (*Id.* at pp. 611–614.) A redacted version of the statement was admitted at the defendant's trial as an admission against the accomplice's penal interest. (*Id.* at p. 609.) Included among the statements that were admitted against the defendant were the declarant's contentions that he had merely shot at the victim's house by mistake, and that he had " 'shot high, at the roof,' " thereby suggesting that he, the declarant, was not the shooter responsible for injuring the victim and implicitly suggesting that "others who were or might become implicated should bear a greater share of the responsibility." (*Id.* at p. 613.)

The *Duarte* court noted that " 'the precedents in the hearsay area provide a persuasive reminder that declarations against penal interest may contain self-serving and unreliable information' and, consequently, 'an approach which would find a declarant's statement wholly credible *solely because* it incorporates an admission of criminal culpability is inadequate.' " (*Duarte*, *supra*, 24 Cal.4th at p. 611.) "As scholars have observed, ' "a self-serving statement lacks trustworthiness whether it accompanies a disserving statement or not." ' " (*Ibid.*)

After considering other authorities, the *Duarte* court explained: "Under the rule of *Leach*, a hearsay statement 'which is *in part inculpatory and in part exculpatory* (e.g., one which *admits some complicity but places the major responsibility on others*) does not meet the test of trustworthiness and is thus inadmissible.' " (*Duarte*, *supra*, 24 Cal.4th at

p. 612, italics added, quoting *In re Larry C.* (1982) 134 Cal.App.3d 62, 69.)[1] Applying these rules, the *Duarte* court concluded that the redacted statement made by the defendant's accomplice, when viewed in context, was self-serving and thus had been improperly admitted. (*Duarte*, at pp. 612–613.)

The statements at issue in *Duarte* are similar to those at issue in the present case. In the statements attributed to Smith, Smith admits some complicity in placing herself at the scene of the burglary and murder, but clearly places the major responsibility for the crimes on Mitchell and another unnamed man, maintaining that she stood by, pleading "[L]et's go, let's go," while "[t]hey" placed a pillowcase over the victim's head, tied her up and beat her unconscious.

The majority cites *Gordon*, *Wilso*n, and *Greenberger* as support for its conclusion that statements that are partially exculpatory of the declarant and that inculpate the defendant are admissible under the declaration against interest exception. However, the majority fails to note that all three of these cases predate the Supreme Court's elucidation of the *Leach* rule in *Duarte*. In addition, the majority fails to fully discuss *Duarte*, which is clearly relevant here, given that it speaks directly to a scenario that is quite similar to the scenario that exists in this case, in which the declarant inculpates herself but shifts

---

[1]     Although the principle animating the declaration against interest exception to the hearsay rule is a consideration of the trustworthiness of a statement made against one's interests, California does not provide a hearsay exception for any statement determined to be generally reliable or trustworthy: "California, unlike federal courts and some state jurisdictions, does not have a 'residual hearsay' exception that permits any hearsay statement into evidence as long as it bears sufficient indicia of reliability." (*In re Cindy L.* (1997) 17 Cal.4th 15, 27–28; accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1289 & fn. 24.)

4

more blame to the defendant.[2] *Duarte* unequivocally states that statements in which the context demonstrates that the declarant is attempting to shift the majority of the blame to a third party are untrustworthy and not properly admissible under the exception for statements against interest.

The majority suggests that the fact that the court in *Grimes* cited with approval *People v. Samuels* (2005) 36 Cal.4th 96, 101–106 (*Samuels*), means that the statements at issue in the present case were properly admitted. In *Samuels*, the defendant asked an accomplice to murder her husband. Once the accomplice had completed the act, the defendant successfully solicited two other men to murder the original accomplice. At the defendant's trial, a witness testified that the original accomplice had said, " 'He had done it and Mike [Silva] had helped him. And that [the defendant] had paid him.' " (*Id.* at p. 120.) The *Samuels* court held that this entire statement was properly admitted as a declaration against penal interest, despite the reference to the defendant: "This

---

2       The majority attempts to distinguish this case from *Duarte*, asserting that there, the declarant "made statements about the defendant that did not *directly inculpate* the declarant," and contending that the "record in *Duarte* is so different from the record here." (Maj. opn. *ante*, at p. 38, italics added.) However, the *Duarte* court described the statements at issue in the following manner: "[The statements] tended sympathetically to describe [the declarant's] *participation in the shooting* of the Sullivan residence, to minimize his responsibility for the injuries caused thereby and to imply that others who were or might become implicated should bear a greater share of the responsibility." (*Duarte*, *supra*, 24 Cal.4th at p. 613, italics added.) Clearly the declarant in *Duarte* inculpated himself in the crime by his statements, admitting his participation in shooting at the victim's house. Nevertheless, although the declarant inculpated himself, directly, in the crime, the Supreme Court concluded that the net effect of his statements was to cast himself in a more sympathetic light than the defendant. Given the similarities between the situations in *Duarte* and in this case, it is clear that *Duarte* is particularly relevant to the case at hand.

admission, volunteered to an acquaintance, was specifically disserving to [the original accomplice's] interests in that it intimated he had participated in a contract killing—a particularly heinous type of murder—and in a conspiracy to commit murder. Under the totality of the circumstances presented here, we do not regard the reference to [the] defendant incorporated within this admission as itself constituting a collateral assertion that should have been purged from [the witness's] recollection of [the original accomplice's] precise comments to him. Instead, the reference was inextricably tied to and part of a specific statement against penal interest." (*Id.* at pp. 101–106, 121.)

However, unlike in this case, in *Samuels*, the declarant did not *shift* blame to the defendant. Rather, the declarant merely *spread* the blame by equally inculpating himself as having solicited two men to murder the original accomplice and admitting that he had done so, but also stating that the defendant had paid him to do it. Further, unlike in *Samuels*, many, if not all of Smith's statements inculpating Mitchell are not "inextricably tied to and part of" a specific statement against her penal interest. Rather, the statements concerning Mitchell's alleged actions are, for the most part, entirely separate from statements describing Smith's own actions.

Most recently, in *Grimes*, the Supreme Court reiterated that courts are to take a contextual approach when evaluating statements that are offered under the declaration against interest exception. In that case, the trial court allowed in evidence an accomplice's statement that he had murdered the victim. (*Grimes, supra*, 1 Cal.5th at p. 710.) However, the trial court excluded the portion of the accomplice's statement in which he stated that the defendant had not taken part in the killing, determining that this

6

portion of the statement was not specifically disserving to the accomplice's interest. (*Ibid.*) The *Grimes* court concluded that the trial court's ruling with respect to the accomplice's statement reflected a misunderstanding of the law governing the admission of declarations against interest. (*Id.* at p. 712.)

The majority asserts that *Grimes* "instructs that courts may consider whether the portion of a confession that tends to exculpate the declarant nonetheless may be admitted 'in view of surrounding circumstances, even though the exculpatory portion of the statement is not independently disserving of the declarant's interests.' " (Maj. opn. *ante*, at p. 31, quoting in part *Grimes*, *supra*, 1 Cal.5th at p. 715.) However, this is clearly *not* what *Grimes* states. Rather, *Grimes* holds that pursuant to the *Leach* rule, those portions of a confession that tend to *exculpate another, rather than to shift blame or curry favor,* should be admitted in view of surrounding circumstances, even though the exculpatory portion of the statement is not independently disserving of the declarant's interests. In *Grimes*, unlike in this case, the declarant's statement *exculpated* the defendant, and it was the defendant who sought the admission of the statements; the *Grimes* court held that the trial court's exclusion of the exculpatory statement was error, even though the statement was not specifically disserving of the declarant's interests. The court *did not* hold, as the majority suggests, that a declarant's *self-exculpatory* statements are properly admissible under the exception for declarations against interest "in view of surrounding circumstances."

In explaining how courts should apply the exception for declarations against interest, the *Grimes* court considered the United States Supreme Court's decision in

7

*Williamson*, *supra*, 512 U.S. 594, which involved a situation in which part of the confession at issue was self-inculpatory, but other parts were self-exculpatory. (*Grimes*, *supra*, 1 Cal.5th at pp. 713–714.) In *Williamson*, the police apprehended a man with two suitcases of cocaine in the trunk of his car. The man admitted that he had been knowingly transporting the cocaine and told police that Williamson had furnished the cocaine to him. At trial, the man who was found with the cocaine refused to testify. The trial court permitted the government to introduce his hearsay statement that Williamson was the source of the cocaine. (*Williamson*, *supra*, at pp. 596–597.) The United States Supreme Court held that admission of the hearsay statement against Williamson was error because the statement that Williamson had furnished the cocaine was not self-inculpatory of the man who had been transporting the cocaine. The *Williamson* court observed that the portion of the statement in which the man blamed Williamson was "actually self-exculpatory," and asserted that the "commonsense notion that reasonable people . . . tend not to make self-inculpatory statements unless they believe them to be true" had no application to that portion of the driver's statement in which he pointed the finger at Williamson while also admitting to knowingly transported cocaine. (*Id.* at p. 599.)

The *Grimes* court, quoting with approval the application of the *Williamson* rule in *U.S. v. Paguio* (9th Cir. 1997) 114 F.3d 928 (*Paguio*), explained that " 'the statement [sought to be admitted or excluded under section 1230] must be examined in context, *to see whether as a matter of common sense the portion at issue was against interest* and would not have been made by a reasonable person unless he believed it to be true.' "

8

(*Grimes*, *supra*, 1 Cal.5th at pp. 714–715, italics added.)  Thus, " '[a]s a matter of common sense,' the [*Paguio*] court explained, *this is less likely to be true when the statement takes the form* ' "*I did it, but X is guiltier than I am*," ' than when the statement is ' "I did it alone, not with X."  That is because the part of the statement touching on X's participation is an attempt to avoid responsibility or curry favor in the former, but to accept undiluted responsibility in the latter.' "  (*Grimes*, *supra*, at p. 715, italics added.)

The *Grimes* court adopted the *Paguio* court's reasoning, determining that ultimately, the question that a trial court must ask with respect to the hearsay exception created by section 1230 is "[w]hether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' "  (*Grimes*, *supra*, 1 Cal.5th at p. 716.)  The *Grimes* court reiterated that "such a statement is more likely to satisfy the against-interest exception when the declarant accepts responsibility and denies or diminishes others' responsibility, as in the example, ' "I robbed the store alone," ' as opposed to attempting to assign greater blame to others, as in the example, ' "I did it, but X is guiltier than I am." ' "  (*Ibid.*)

Applying the above rules to this case, the issue is whether Smith's out-of-court statements were specifically self-disserving and sufficiently trustworthy/reliable to be admissible pursuant to the exception for declarations against interest.

Examining the challenged statements in context, I disagree with the People's assertion that the statements that Smith is alleged to have made to Williams and Lott were properly admitted against Williams because the statements "were entirely disserving

9

to [Smith] as she wholly and *equally* implicated both herself and Mitchell in the burglary and murder." (Italics added.) Clearly, the statements were not "entirely disserving" to Smith and they did not "equally" implicate her. As explained further below, given the requirements of the exception for declarations against interest as set forth in *Leach*, *Duarte*, *Samuels*, and, most recently, in *Grimes*, I would conclude that the trial court erred in ruling that the statements were admissible against Mitchell under this exception. Several portions of the statements that were admitted were not "specifically disserving" of Smith's interests, but rather, were self-exculpatory. Many portions of the statements constitute a clear attempt by Smith to shift the majority of the blame to Mitchell and away from herself. In other words, the statements in this case present precisely the scenario against which the *Grimes* cautioned, in which a declarant attempts to assign greater blame to others than herself, such as in the example, " ' "I did it, but X is guiltier than I am." ' " (*Grimes*, *supra*, 1 Cal.5th at p. 715.) Indeed, virtually every reference Smith purportedly made with respect to Mitchell involves a claim that he, and not Smith, was effectively the "guiltier" party because he was the one who engaged in violence against the victim and/or bore more responsibility for placing the victim in a precarious circumstance. As a result, one cannot say that " 'a reasonable [person] in [the declarant's] position would *not* have made the statement unless [s]he believed it to be true.' " (*Grimes*, *supra*, at p. 716, italics added.) The statements at issue, in which Smith

10

essentially said that Mitchell was more culpable than she was, were, in my view, improperly admitted in evidence.[3]

  i.  *The evidence of Smith's statements to Williams, as reported by Johns*

The statements that Johns told investigators she overheard Smith make to Williams were not specifically disserving to Smith, such that they were properly admissible against *Mitchell*.  Again, "[e]ven a hearsay statement that is *facially inculpatory of the declarant* may, when considered in context, *also be exculpatory or have a net exculpatory effect*," and thus, not be admissible as a declaration against interest.  (*Duarte*, *supra*, 24 Cal.4th at p. 612, italics added.)  Many of the inculpatory portions of the statements that Smith is alleged to have made to Williams involved statements that, while implicating Smith in the burglary, minimize Smith's own involvement while placing more blame on Mitchell for what occurred.  For example, Smith claimed that Mitchell was the one who came up with the idea to cover the victim's head with a pillowcase, that it was Mitchell's idea to bind the victim, and that it was Mitchell who beat the victim unconscious.  Other portions of Smith's statements were also particularly self-serving, as opposed to self-disserving.  For example, according to Johns, Smith said that she, Smith, could not believe what was happening when Mitchell began beating the woman.  None of these portions of the statements that Smith

---

3     In addition, at least with respect to Johns's statements about what she claimed to have overheard Smith telling Williams about the burglary, there were significant questions about the reliability of these statements.  These questions undermine the prosecution's showing that the declarations that it sought to admit were "sufficiently reliable to warrant admission despite [their] hearsay character."  (*Duarte*, *supra*, 24 Cal.4th at pp. 610–611.)

11

purportedly made was specifically disserving.  Rather, these statements essentially conveyed the message, " ' "I did it, but [Mitchell] is guiltier than I am," ' " (*Grimes*, *supra*, 1 Cal.5th at p. 715), or even, "I was there but Mitchell is the guilty one."  Under *Grimes*, none of these statements qualifies as a statement against Smith's interest.

The People maintain that Smith's statements were "wholly disserving" of her own interests, and contend that she "implicated herself in the burglary and murder *without attempting to shift blame or cast herself in a more favorable or sympathetic light*." (Italics added.)  This statement is simply inaccurate.  By placing responsibility for all of the violence directed at the victim squarely on Mitchell's shoulders, Smith's statements cannot reasonably be viewed as anything other than Smith minimizing her own culpability and shifting all or most of the blame to Mitchell, thereby casting herself in a more favorable or sympathetic light.  In this way, Smith's statements are similar to the statements made by the defendant's accomplice in *Duarte*, *supra*, 24 Cal.4th at p. 613, which were determined to be inadmissible pursuant to the against-interest exception.  In that case, as here, the declarant implicated himself in the crime by admitting his participation in the crime, acknowledging that he had shot at the house where the victim was, but also minimized his own role in the crime by claiming that he had " 'shot high' " because he did not want to kill or hurt someone.  The Supreme Court determined that these statements tended to "sympathetically" describe the declarant's own participation and "minimize his responsibility for the injuries caused [by the shooting]."  (*Ibid.*) Smith's statements even more clearly tend to describe her participation in a sympathetic

12

light and minimize her responsibility in the crime, while also more clearly shifting blame to Mitchell.[4]

Further, the statements that Johns said she overheard Smith make to Williams cannot be deemed to be sufficiently reliable for admission under the hearsay exception for declarations against interest. (See *Duarte*, *supra*, 24 Cal.4th at pp. 610–611 [party seeking to admit evidence pursuant to the declaration against interest exception "must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made *and that the declaration was sufficiently reliable to warrant admission despite its hearsay character*" (italics added)].) The record contains a significant amount of evidence that casts doubt on the reliability of Johns's statements concerning Smith's purported statements. This case presents a unique circumstance with respect to the "reliability" of the statements, separate from whether the statements were, in fact, declarations against the declarant's interest. While the statements at issue were ostensibly made in the "most reliable circumstance" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335) because they were purportedly made by Smith in a noncoercive setting—i.e., to an acquaintance in Johns's home, there are other factors that undermine the reliability of these statements. First, the statements were presented through the use of

---

4    Further, although Smith's statements may have, as a legal matter, implicated her not only in the robbery/burglary, but in Kelley's murder as well, as a result of the felony murder rule, the exception for statements against interest focuses on whether a "reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) A "reasonable" person would not necessarily recognize the full legal import of the felony murder rule; rather, such a person would likely believe that it was *in* her penal interest to minimize her role and place the blame for an unintended death on an accomplice.

13

other out-of-court statements made by Johns to a police detective, creating double hearsay and an additional level of reliability concerns.[5]  Although Johns's statements to the detective were admissible pursuant to the prior inconsistent statement exception to the hearsay rule on the ground that Johns recanted at trial and claimed that she never overhead Smith make the statements at issue, the record demonstrates that Johns's statements about Smith's statements may not have been sufficiently reliable to warrant the admission of Smith's statements (through Johns's statements) pursuant to the hearsay exception identified in Evidence Code section 1230, even if the statements had been sufficiently disserving of Smith's interest.

Mitchell also suggests that Johns was an unreliable witness, given the fact that she admitted to being vindictive and said that she had made up the entire story because she was angry with her son and wanted to get revenge.  There is evidence that supports Johns's trial testimony concerning how she knew certain information about the crime, including the fact that after being arrested for possession of stolen property, Mitchell had left court papers, including police reports, with her that were related to the crime, and the fact that she claimed to have done Internet research regarding the Kelley murder. Further, it is not solely Johns's recantation of her statements to police that calls into question the reliability of those statements.  Even more concerning is the fact that Williams, to whom Smith's statements were purportedly directed, specifically and

---

[5]     The California Supreme Court has acknowledged that "the probative value of hearsay evidence decreases with each level of hearsay."  (*People v. Zapien* (1993) 4 Cal.4th 929, 956.)

14

unequivocally denied under oath that the conversation that Johns claimed to have overheard between Smith and Williams ever took place.

Williams testified at trial that she lived with Johns for two or three months. Williams met Smith, whom she knew as Mitchell's girlfriend, when Williams began living with Johns. Williams testified that while she was in the county jail after having gotten into "[a] major argument" with Johns, Smith was also being housed there, and they were both "staying in the same area." Williams heard Smith tell others "why she was in jail" while they were "all sitting eating." Williams overheard Smith say "that her and her boyfriend and some friends were robbing houses, and that it was kind of cool at first until the end. She got caught up." Smith indicated that "it went bad, and she got caught up."

However, when asked whether she had ever had a conversation with Smith about a specific home invasion, Williams stated emphatically that no such conversation had occurred:

> "Q    Okay. Now, in – after September 15th did Kiesha Smith braid your hair?
>
> "A    I don't know the dates, but I do remember her braiding my hair once, yes.
>
> "Q    Do you have any discussions – was there any discussions during the time that your hair was being braided concerning any incident where Miss Smith was supposedly involved in any burglaries?
>
> "A    No.
>
> "Q    Okay. So if Miss Johns indicated that you were getting your hair braided and that Kiesha and you were having a discussion about a burglary ultimately that ended in a death, would that be true or untrue?

15

"A    That would be false. We never had a discussion.

"Q    So it is your testimony today that if Miss Johns testified to a long discussion between yourself and Miss Smith that she ultimately came into, would that be true or untrue?

"A    That would be false.

"Q    Okay. Now, if you would have had information concerning that would you have stayed living in that house?

"A    Heck, no. No. I wouldn't. I would have been gone."[6]

Williams did not have the credibility issues that Johns had. For example, there is nothing to indicate that Williams was biased either for or against Smith or Mitchell. She provided other incriminating details about Smith of which she had become aware, including statements that she claimed Smith had made on a different occasion, but she unequivocally denied having had a conversation with Smith about one particular home burglary, as Johns related during her police interview.

It is well understood that the "focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration." (*People v. Frierson* (1991) 53 Cal.3d 730, 745.) Given the significant questions regarding the reliability of Johns's statements about Smith's purported statements to Williams—statements that focus blame on Mitchell, I would conclude that in addition to failing to qualify as statements against the declarant's interest because in context, the statements are exculpatory and shift

---

[6]    Williams was living at Johns's home when police executed a search warrant at the home. She moved out immediately after the day of the search of the home. She indicated that she was "kind of taken aback when the police came to the house," so she "went to Texas to go stay with [her] mom," where she stayed for two or three weeks.

16

the blame to Mitchell, the statements also lack sufficient indicia of reliability to render them admissible against Mitchell as statements against interest.

Given the lack of reliability and trustworthiness of the statements that Smith purportedly made to Williams, as recounted by Johns, these statements, in which Smith minimized her own role and shifted the majority of the blame to Mitchell for any harm to the victim, under the holdings in *Leach*, *Duarte*, *Samuels*, and *Grimes*, the statements at issue should have been redacted from the Johns interview before the contents of that interview were presented to the jury. Because these statements minimized Smith's own culpability and shifted blame away from Smith and onto Mitchell, *Grimes* affirms that the statements in which Smith implicates Mitchell cannot be considered to have been against Smith's self-interest and, therefore, were not properly admissible under the against-interest exception to the hearsay rule.

ii. *The evidence of Smith's statements to Lott*

The statements that Smith made to Lott also shifted blame to others, including Mitchell, and away from Smith. Although the statements may be facially inculpatory, in that Smith placed herself at the scene of the crime, her comments clearly minimized her own role in the crimes and placed blame for any injury to the victim on Mitchell and another individual. According to Lott, Smith said that "*they*" put a pillowcase over the woman's head, and then "proceeded to beat her," while Smith "was trying to get *them* to stop." (Italics added.) Thus, contrary to the majority's suggestion, "they" clearly referred to Mitchell and the other unnamed man, *not* to Mitchell and Smith. Smith specifically said that her "boyfriend" put the pillowcase over the woman's head, and "[t]he cousin"

17

was the one who tied up the victim. According to Lott, Smith also said that she urged the group to leave, saying, "[L]et's go, let's go." Like the statements attributed to Smith by Johns, these statements purportedly made by Smith to Lott (or overheard by Lott) were clearly not specifically disserving to Smith's interests. Rather, the statements, in context, were, at most, essentially various forms of the message, " ' "I did it, but [Mitchell] is guiltier than I am." ' " (*Grimes*, *supra*, 1 Cal.5th at p. 715.) In fact, the statements essentially said, "I was present, but Mitchell and another man are responsible for the murder, and I tried to get them to stop." For this reason, the statements cannot be considered to be declarations against Smith's interest.

I would conclude that the trial court erred in finding that Smith's purported statements to other individuals were all statements against *Smith's* interest, and that the court abused its discretion in admitting these statements in their entirety against Mitchell, including those portions in which Smith implicated Mitchell by specifically shifting blame away from herself and onto Mitchell.

iii. *The erroneous admission of these statements was prejudicial*

The majority concludes that the admission of the statements attributed to Smith were not prejudicial to Mitchell. In reaching this conclusion, the majority states, "In this regard, the court's discussion of prejudice in *Grimes* is particularly telling. Even though the court in *Grimes* found that it was error to exclude the killer's statement, with respect to the jury's finding the defendant acted with reckless indifference to human life and was therefore eligible for the death penalty, the court found that the error was not prejudicial." (Maj. opn. *ante*, at p. 39.) However, the majority fails to acknowledge that *Grimes*

18

involved the erroneous *exclusion* of a single *exculpatory* statement in a case in which the evidence against the defendant was overwhelming, while this case involves the erroneous *admission* of numerous *inculpatory* statements in a case lacking direct evidence of the defendant's guilt. I would conclude that the error in permitting the prosecution to introduce Smith's statements that were not specifically self-disserving in the trial against Mitchell was prejudicial under the *Watson*[7] standard since, in my view, there is a reasonable probability that the outcome of Mitchell's trial would have been different if the trial court had excluded the erroneously admitted hearsay statements.

Without Smith's hearsay statements about what occurred inside the Hassett residence, the prosecution's case against Mitchell was entirely circumstantial and fairly weak. There was no physical or other forensic evidence indicating that the defendants were ever present inside the Hassett residence. Other than Smith's hearsay statements, the only other significant evidence that linked Mitchell to having been present at the Hassett residence on the day Kelley was killed was Beck's testimony, and Beck's value as a witness was highly questionable. Beck was herself implicated in the crime and admitted that she "took the deal" from the prosecution so that she "wouldn't get prosecuted for murder."

In addition, Beck, the prosecution's star witness and the person on whom the prosecution relied for the bulk of their evidence implicating Smith and Mitchell, had difficulty identifying Mitchell in photographic lineups, despite claiming that the group

---

[7]     *People v. Watson* (1956) 46 Cal.2d 818

had planned the crime together and that Mitchell had pointed a gun at her. Beck could not remember what time she had been at the Hassett residence on the day Kelley was killed, and her testimony about a variety of details surrounding the incident were inconsistent, at best. Further, Beck was unable to provide any information as to what actually occurred inside the house. She said that she was not present "when the incident occurred," and conceded that she had no idea "what happened to Derrick's grandmother" because she "wasn't there." Therefore, absent Smith's statements about Mitchell, there was a dearth of evidence placing the defendants at the Hassett residence, and there was no evidence as to what happened in the residence that day.

Further, there were a number of other people who were admittedly in the Hassett home on the day of the robbery—i.e., there were a number of third parties who could have played a role in the burglary and killing of Kelley. In fact, the police initially suspected at least one other person of committing this crime—Derrick Hassett—and had arrested him for the crime.

The prosecution's case against Mitchell relied *heavily* on Smith's statements inculpating Mitchell and herself in the burglary and Kelley's death. In light of the foregoing, particularly the absence of any testimony by an eyewitness to the burglary and the lack of physical evidence linking Mitchell to the crime, I would conclude that it is "reasonably probable that a result more favorable to defendant would have been reached" (*Watson*, *supra*, 46 Cal.2d at p. 837) if the trial court had not erred in admitting Johns's and Lott's testimony relating Smith's hearsay statements that were not wholly disserving of Smith's own interests and that shifted the majority of the blame to Mitchell.

AARON, J.