Filed 4/9/20

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID ARCE,<br><br>    Defendant and Appellant. | A153460<br><br>(Contra Costa County<br>Super. Ct. No. 05-150405-9) |

David Arce appeals the judgment entered following his convictions by jury trial for first degree murder with the criminal street gang special circumstance and possession of a firearm by a convicted felon. He was sentenced to state prison for a term of life without the possibility of parole. In the published part of this opinion, we consider and reject appellant's claim that Penal Code[1] section 190.2, subdivision (a)(22), a criminal street gang special circumstance statute, is unconstitutionally vague.

In the nonpublished portion of this opinion, we address appellant's remaining claims that the trial court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter under a theory of imperfect self-defense, that the court improperly instructed the jury on the consideration of accomplice testimony, and that reversal is required based on

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication, with the exception of part II. A., B., D. and E.

    [1] Undesignated statutory references are to the Penal Code.

1

cumulative error.  He also challenges his sentencing on the firearm possession count.  The People concede the abstract of judgment must be corrected to reflect the imposition of a concurrent term for the firearm conviction.  We remand the matter to the trial court to make this correction.  In all other respects, we affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In March 2015, the People filed an indictment against appellant and Thomas William Burk, charging them with first degree murder of Earl Hamilton (§187, subd. (a); count 1).  The indictment included a special circumstance allegation that appellant committed the murder while actively participating in a criminal street gang (§ 190.2, subd. (a)(22)).  Appellant was also charged with being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2).  The indictment further alleged the crimes were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and that appellant personally discharged a firearm causing great bodily injury (§ 12022.53).  Appellant's prior convictions were also alleged, including a 2011 conviction for carrying a concealed firearm (former § 12025, subd. (a)(1)) and a 2012 conviction for discharging a firearm with gross negligence (§ 246.3, subd. (a)).  The indictment also included prior strike and prison term allegations.  The People did not seek the death penalty.

Jury trial commenced in August 2017.  Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

### A.    The Prosecution's Evidence

#### i.  *The Murder of Earl Hamilton at the Green Lantern*

Appellant, Thomas Burk, and Eduardo Bonilla were members of the Varrio San Pablo (VSP) gang, a subset of the Norteño street gang.  Bonilla

2

met appellant in 2004, and through appellant, other VSP gang members. Over a three-year period, Bonilla "put in work" to become a VSP gang member himself by committing drug sales, assaults, and tagging.

Bonilla and appellant became estranged following a 2012 incident in San Francisco in which appellant was injured in a fight with Sureño gang members outside a bar. Following the altercation, appellant retrieved a gun from Bonilla's car and fired several shots in the direction of the 16th Street BART station. They were arrested and Bonilla told police that he and appellant were Norteños. Because Bonilla was released from custody while appellant was convicted of discharging a firearm, appellant believed Bonilla had cooperated with police. After appellant was released from prison, he spoke to Bonilla about their rift. Appellant told Bonilla that since their families were close, he would not harm Bonilla but they were no longer friends. Their conversation occurred four months before the murder of Earl Hamilton.

On the evening of February 1, 2014, appellant and Burk were having drinks at the Green Lantern, a bar in Pinole that attracted a diverse mix of customers. Appellant's sister had hosted a bachelorette party at appellant's home and when the party ended, several of the guests went to the Green Lantern. Bonilla arrived later that night with a mutual friend, Monica Moreno. Members of various other gangs were at the bar as well, including North Richmond gang members. The VSP gang did not have any ongoing disputes with that gang.

Bonilla, Moreno, Burk, and appellant went outside to Bonilla's car to drink some alcohol. They noticed two North Richmond gang members who had previously been in a conflict with Bonilla's sister's boyfriend. After these gang members entered the bar, appellant's demeanor changed and he called

3

someone on his cell phone. He then told Burk that he had to leave but would return. Appellant was gone for about two hours and then returned to the bar.

Appellant had placed a call with his friend Roland Vides around 9:30 or 10:00 p.m. He told Vides he was at the Green Lantern and asked to borrow a gun. According to Vides, "He just said he was going to be at that bar. So I gave it to him to have for defense." Vides placed the gun in an unlocked car for appellant. He had loaned the gun to appellant before. Appellant drove five miles and retrieved a loaded .40 caliber semiautomatic Glock 23 pistol from Vides's vehicle. By the time appellant returned to the Green Lantern, more people had arrived from appellant's house party as well as about 10 or 11 more people from North Richmond, including a white man named Scott (Scotty) Haskell, a member of the MTM Norteños gang whom Bonilla had known for several years.

Scotty was with a group of African-American men who were playing pool. Some of the men were from the North Richmond, Easter Hill, and Team Hello gangs. Among them was the victim, Earl (Juju) Hamilton, who walked with a limp and had a deformed arm on the same side as his bad leg. At about 11:30 p.m., there was a minor argument between the Hispanic and African-American groups. The bouncer warned them that he would close the bar and make everyone leave if there was any more trouble. Order was restored for the time being.

Monica Moreno complained to Bonilla that Scotty had, in a previous incident, kicked her sister in the face during a fight between Scotty's sister and Moreno's sister. Bonilla declined to confront Scotty and told Moreno to calm down. Instead, Moreno approached Burk and told him about the incident. Burk then confronted Scotty. Bonilla and appellant went to Burk's side as they loudly exchanged fighting words with Scotty and the North

4

Richmond gang members. Scotty shouted "fuck San Pablo" and "North Richmond" while Bonilla and Burk responded by shouting "fuck Richmond" and "San Pablo." One witness, Britney Perez, testified that she saw Bonilla and others arguing with a white man and a couple of black men. The white man seemed to be the instigator and was very hostile. The bar bouncer intervened and told everyone to leave. Bonilla, Burk, and appellant went out through the back door by the pool tables. Three men, including Hamilton, followed.

Hamilton verbally confronted Bonilla outside. Bonilla told him the fight had nothing to do with him. Hamilton approached Bonilla in an aggressive manner and Bonilla shoved him backwards. As Bonilla squared up to fight, he heard the cocking of a gun and saw appellant holding a black handgun pointed at Hamilton's chest. Appellant said to Hamilton, "What's that shit you were talking?" Hamilton fell backward into the rear bumper of a parked SUV and said, "Don't shoot." As Bonilla ran to his car he heard three shots. He looked back and saw Hamilton lying down and not moving. Appellant and Burk began to walk away from Hamilton. Appellant then returned to where Hamilton was slumped, placed the gun to his head, and fired an additional round.[2]

Hamilton suffered two gunshot wounds, one to his head and one to his chest. The chest shot penetrated down the left side of his torso and into his abdomen. Both shots were fatal. No weapons were found on Hamilton's

---

[2] Perez testified that she heard three gunshots from inside the bar. When the bouncer allowed her to exit, she saw Bonilla running toward his car. He looked panicked and confused. She saw defendant standing next to Burk holding a black gun in his right hand and the victim lying on the ground several feet away. Perez heard two gunshots, followed by a pause, and then a third gunshot.

body. At no point did Bonilla see Hamilton with a gun. A bar patron who was an EMT trainee called 911 and waited for an ambulance. Hamilton died before paramedics and police could arrive.

Appellant and Burk fled in appellant's car. Bonilla left with Moreno. As Bonilla drove, he noticed appellant was following him. They both pulled into a parking lot. Appellant approached Bonilla and asked him if he could be trusted. Bonilla said yes, worried that if he said anything else he would have been shot. Several of the people at the bar, including appellant, met later at a park. One of appellant's sisters asked him, "What the fuck did you do? Why did you shoot him?" Appellant replied, "He ran up on the wrong motherfucker."

Appellant returned the gun to Vides the next morning. He told Vides he had shot someone in the stomach and the head. He explained there had been a confrontation between Burk and a guy named Scotty over a girl named Monica. When Vides asked why he had to use the gun, appellant "just said he had to use it." Appellant referenced the 2012 San Francisco incident when Sureños cut his neck with a bottle, and said "he wasn't going to let somebody hurt him again." Appellant did not say that the person he shot had a weapon.

Appellant asked Vides to get rid of the Glock 23. Vides agreed because he was afraid of appellant. Vides disassembled the gun and drove to Sacramento that morning to the home of a friend, Carlos Shaneyfelt. Vides later identified his gun at trial.[3] Shaneyfelt testified that Vides came to see him in Sacramento in February of 2014. Vides was nervous and asked him to

_____

[3] Vides was in the witness protection program when he testified. As a condition of the program, he was required to be truthful in his testimony. He was not prosecuted for his involvement in this crime.

6

get rid of a gun for him. Shaneyfelt took the gun to a friend's house hoping to sell it but received no offers. About two weeks later, Vides called and asked for the gun back. Shaneyfelt lied and told Vides he had thrown the gun in the river.

### ii. Police Investigation of the Murder

The Pinole Police Department recovered four casings, two bullet jackets, and a lead projectile in the parking lot of the Green Lantern. Police officers searched Vides's home and he agreed to cooperate with the investigation. The police were directed to Shaneyfelt's house to investigate the whereabouts of the murder weapon. Shaneyfelt retrieved the Glock 23 from his friend's home and gave it to the officers. Forensic testing later showed that the shell casings found at the crime scene had been fired from the same weapon recovered from Shaneyfelt.

Detective James Johantgen was assigned to investigate the murder. He reviewed surveillance video taken inside the bar. The first time he watched the video, he thought Bonilla may have had a two-toned firearm in his hand. Later, when the video was enhanced by the FBI, it showed that Bonilla was not holding a gun but instead was holding an object that emitted light.

Bonilla was arrested for the murder a few weeks later. He lied to officers about having pushed Hamilton and witnessing the murder. Bonilla testified at appellant's trial, stating he had not been promised anything in exchange for his testimony. He explained he had lied to detectives because he wanted to minimize his involvement and he feared retaliation from other VSP members. Appellant had already threatened him by showing him a gun and saying that if people did not stop running their mouths, "he had something for them." Bonilla decided to tell the truth because he felt that the

victim did not deserve to be killed. He denied having a gun that night and denied shooting the victim.

### iii. Gang-related Evidence and Expert Testimony

On September 24, 2011, appellant attended a group picnic at a park in San Rafael. Some Hispanic men approached the gathering and one of them became aggressive. Appellant responded and a heated argument ensued. The man reached for his waistband. Appellant pulled out a gun and someone screamed, "[H]e has a gun." People fled the picnic. Police stopped the car that appellant was riding in and found an unregistered loaded handgun under his seat. Appellant matched a witness's description of the man who had been waving the gun.

On the night of March 2, 2012, appellant and other VSP gang members, including Bonilla, went to a bar in San Francisco near the 16th Street BART Station. Appellant had an altercation with Sureño gang members outside the bar. They attacked him and stabbed him in the neck with a broken bottle. Bonilla retrieved his car and drove it to appellant's location, and two others in their group helped appellant into the car. Appellant pulled a firearm from underneath the car seat and fired multiple gunshots in the direction of numerous people across the street at the 16th Street BART station. Police intercepted the vehicle and arrested the occupants. Appellant was convicted of discharging a firearm with gross negligence and sentenced to a prison term.

San Pablo Police Department Sergeant Ravinder Singh testified as a gang expert on behalf of the prosecution. He explained that VSP is a Norteño subset that operates in San Pablo. Symbols associated with this gang are VSP, the number 14 representing "N" as the 14th letter of the alphabet, and the Huelga bird. The Norteño rival gang is the Mexican Mafia, also known as

Sureños. Sureños are associated with the color blue and the number 13. In February 2014, VSP consisted of no fewer than 10 members. The VSP gang is a criminal organization that commits crimes such as selling drugs, robberies, carjackings, theft, as well as breaking into houses and cars. They also commit assaults, robberies with injuries, and even murder. They use firearms to commit crimes and to protect themselves from rival gang members. Guns are a very important tool in the gang culture.

VSP members value the use of violence because violence promotes respect within the gang and deters people from informing against them. Gang members who lack respect will not be taken seriously by their own gang or by their rivals. If a gang member feels disrespected it could lead to a fight or a violent incident causing injury or death. Persons who cooperate with law enforcement or testify in court against fellow gang members are considered "snitches" and are subject to retaliation.

Based on his prior contacts with appellant, Sergeant Singh testified that appellant was an active VSP member in February 2014. He had gang tattoos signifying that he was a Norteño gang member. Burk was either a member or an associate of the VSPs, and Bonilla was a VSP gang member. The three men were seen in photographs wearing red and throwing gang signs. Bonilla's presence suggested he was in good standing with the gang, even if he had a dispute with appellant.

When presented with a hypothetical based on the picnic incident in San Rafael, Sergeant Singh opined that if appellant were confronted by Sureño gang members and he brandished a firearm at them, he would be doing so for the benefit of the Norteño gang. Singh was also presented with a hypothetical scenario which described the 2012 altercation in San Francisco and appellant firing shots at a crowd. Singh opined that the shooting would

9

have occurred for the benefit of the VSP Norteño gang because appellant would be expected to shoot at a rival gang member in retaliation for having been injured in a fight.

Regarding Hamilton's murder, Sergeant Singh opined that the crime was also committed for the benefit of, or in association with, the VSP gang. The conflict in the bar had included gang members insulting each other's territories. Gang members will retaliate against individuals that disrespect their turf. This would be true even where the two gangs involved had no preexisting rivalry. Shooting someone who disrespected San Pablo would greatly benefit the San Pablo gang by maintaining the gang's reputation for violence and retribution. That neither appellant, Burk, nor Bonilla were wearing red at the time did not change Sergeant Singh's opinion that the crime was committed for the benefit of a gang.

## B. The Defense Case

Pinole Police Officer Zachary Blume testified he was called to the Green Lantern after the murder and reviewed the surveillance video. He saw two individuals grab Bonilla's right hand to restrain him during the argument. Bonilla appeared to be holding a firearm. Blume described the object as a two-tone semiautomatic firearm with a silver-colored slide and a dark-colored grip. Bonilla later appeared to place the item in his right front pants pocket. Bonilla, Burk, and appellant then exited the bar, followed by the victim. Bonilla appeared to be reaching toward his front right pant pocket as he was walking towards the door. When he later interviewed Bonilla, Bonilla denied having a firearm and said the object was his cellphone.

On cross-examination, Blume said that he had viewed an enlarged still photograph on a screen when he first determined that Bonilla had a weapon.

10

The image was grainy from being enlarged. Later, digitally enhanced images showed that Bonilla appeared to be holding a cellphone with an illuminated screen. Blume stated he could not say for sure the object was not a firearm, but if it was a firearm, it was not an all-black firearm.

In his closing argument, counsel for appellant argued that Bonilla was a liar. The People had not shown that appellant's DNA was on the murder weapon, and he challenged the testimony that Bonilla was holding a cellphone rather than a gun. He concluded: "This case rises or falls on Eduardo Bonilla. If he doesn't stand the test of cross-examination, if you determine him to be a liar, then this case fails."

## C. Conviction and Sentencing

The jury was instructed on the elements of first degree murder (CALCRIM No. 521) as well as the gang special circumstance allegation (CALCRIM No. 736). The trial court declined to issue an instruction on voluntary manslaughter based on a theory of imperfect self-defense. The jury began deliberating in the afternoon of Tuesday, October 3, 2017 and returned its verdict the following morning. It found appellant guilty of first degree murder and found true the gang special circumstance allegation. He was also found guilty of possession of firearm by a convicted felon. The jury found true the criminal street gang enhancement and the firearm enhancement.

On December 1, 2017, the trial court sentenced appellant to an aggregate term of life without the possibility of parole plus 25 years to life. This appeal followed.

## II. DISCUSSION

## A. Voluntary Manslaughter Instruction

Appellant contends the trial court committed reversible error by failing to instruct on voluntary manslaughter under a theory of imperfect

self-defense.  He argues that the court had a duty to instruct on this theory because "[t]he evidence offered during trial showed that [he] had an unreasonable, but good faith belief in the need to act in self-defense" based largely on the injury he suffered in the 2012 altercation in San Francisco. The People contend substantial evidence did not support the instruction and that any error in failing to instruct was harmless.  The People have the better argument.

### *i.  Applicable Legal Principles*

A defendant in a criminal case has a constitutional right to have the jury determine every material issue presented by the evidence.  (*People v. Benavides* (2005) 35 Cal.4th 69, 102.)  Generally, even in the absence of a request, a trial court in a criminal case has a duty to instruct on general principles of law applicable to the case, including lesser included offenses supported by the evidence.  (*People v. Blair* (2005) 36 Cal.4th 686, 744–745, abrogated on another ground in *People v. Black* (2014) 58 Cal.4th 912, , 919– 920; *People v. Valdez* (2004) 32 Cal.4th 73, 115,; *People v. Heard* (2003) 31 Cal.4th 946, 980–981; *People v. Breverman* (1998) 19 Cal.4th 142, 154, 162 (*Breverman*).)

Voluntary manslaughter is a lesser included offense of first degree murder.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)  A trial court is thus required to instruct on voluntary manslaughter if there is substantial evidence to support it.  (*Breverman, supra,* 19 Cal.4th at p. 162.)  "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight."  (*Id.* at p. 177.)  We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense.  (*People v. Cook* (2006) 39 Cal.4th 566, 596; *People v. Waidla* (2000) 22 Cal.4th 690, 733.)

Self-defense is perfect or imperfect.  Perfect self-defense arises when the defendant actually and reasonably believes in the need to defend against imminent bodily injury or death.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  A defendant acts in imperfect self-defense when the defendant actually believes (1) that he or she is in imminent peril of being killed or suffering great bodily injury, and (2) that the immediate use of deadly force is necessary to defend against the danger, but (3) at least one of those beliefs is unreasonable.  (*People v. Her* (2009) 181 Cal.App.4th 349, 352.)

Unlike self-defense, imperfect self-defense is not an affirmative defense but a description of one type of voluntary manslaughter.  (*People v. Michaels* (2002) 28 Cal.4th 486, 529.)  "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually* but unreasonably believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter."  (*In re Christian S.* (1994) 7 Cal.4th 768, 771.)

### ii. No Substantial Evidence Supported the Requested Instruction

During a conference, appellant's attorney argued for a voluntary manslaughter instruction based on Vides's testimony about what appellant said when he returned the gun after the murder.  Defense counsel asserted that, according to Vides, appellant "was scared and acted in self-defense.  He thought the other guy was going to shoot him.  That was his testimony.  That was in his police reports everywhere."  The prosecutor disagreed with counsel's interpretation, correctly noting that appellant had merely described why he "did what he had to do."

The trial court stated that a voluntary manslaughter instruction is generally not given unless the defendant has testified because "the state of

13

mind of the person who is claiming to have acted . . . in self-defense is critical to deciding whether or not what happened here or in any case was voluntary manslaughter."[4]  The court also noted that appellant's trial strategy appeared to be that Bonilla was the shooter, not that appellant acted in self-defense. And while there was evidence that an argument precipitated the shooting, the court observed that if self-defense were to be applied in this case, then "any form of argument on the street which involved any sort of aggressive physical movement would justify giving a voluntary manslaughter instruction."  Finding the evidence insufficient to support the theory, the court declined to instruct on voluntary manslaughter.

While appellant is correct that imperfect self-defense can be predicated on evidence other than a defendant's testimony (see *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1261–1262), he presented almost no evidence on his own behalf.  Appellant called Officer Blume to testify about his initial belief that Bonilla was holding a two-tone semiautomatic firearm at the Green Lantern, a theory that was cast into doubt by FBI enhancement of the surveillance video.  This evidence shed no light on appellant's state of mind at the time of the shooting.

The People's evidence does not support appellant's claim either. Contrary to his contentions on appeal, there was no evidence that appellant actually believed he was in imminent danger of dying or suffering great bodily injury, much less that he believed he needed to shoot Hamilton in self-defense in response to a perceived threat.  For example, there was no testimony that anyone at the Green Lantern had been involved in a prior confrontation with *appellant's* sister's boyfriend, as appellant repeatedly

---

[4] During the conference, defense counsel confirmed that appellant would not be testifying.

alleges. Instead, Bonilla testified that two men who entered the bar had a prior conflict with *Bonilla's* sister's boyfriend.

Vides's testimony does not support a voluntary manslaughter instruction. Vides did not testify that appellant asked to borrow a gun to defend himself. Instead, Vides testified, "He just said he was going to be at that bar. So I gave it to him to have for defense." Regardless, even if appellant had expressed apprehension about the presence of other gang members at the Green Lantern, this exchange occurred hours before the shooting and does not suggest that appellant believed he or anyone else was in imminent peril. " 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Vides also testified that the morning after the murder, appellant said he shot a person with Vides's gun. When Vides asked why he had to use the gun, appellant "just said he had to use it." Appellant mentioned the San Francisco bar fight and said "he wasn't going to let somebody hurt him again." Appellant contends on appeal that this testimony evidences his subjective belief that he fired the gun in fear of getting seriously injured, as he had been in the prior incident. Appellant asks us to infer far too much from one statement.

There is no evidence that appellant feared he was in imminent peril from Hamilton. On the contrary, the evidence shows that Hamilton was not involved in the initial argument inside the bar, and that Hamilton merely

15

postured and raised his voice to *Bonilla* when they were outside. It was Bonilla who pushed Hamilton back and told him the argument had nothing to do with him. Though Hamilton was unarmed and had visible physical disabilities, appellant shot him even as he backed away and begged for his life. After Hamilton was down, appellant turned back to shoot him in the head. When one of appellant's sisters asked him why he shot Hamilton, he did not explain that he was in fear for his life or had acted in self-defense. Appellant replied, "He ran up on the wrong motherfucker."

Simply put, there was no evidence that appellant harbored an unreasonable belief that he or someone else was in imminent danger of being killed or suffering great bodily injury, and no evidence that his use of deadly force was necessary to defend against that danger. Appellant's theory of imperfect self-defense rests on speculation, not substantial evidence. The trial court correctly refused to instruct the jury on imperfect self-defense. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 174 ["Speculation is insufficient to require the giving of an instruction on a lesser included offense."].)

Even assuming the trial court erred by not giving the instruction, the error was harmless. "[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility" under the *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*) harmless error test. (*Breverman, supra,* 19 Cal.4th at p. 165.) "[S]uch misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Ibid.*) We may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so

16

comparatively weak, that there is no reasonable probability the error of which the appellant complains affected the result. (*Id*. at p. 177.)

As discussed above, the evidence supporting the jury's verdict of first degree murder was compelling, and the evidence supporting a manslaughter conviction based on imperfect self-defense was comparatively weak. The only evidence of appellant's state of mind were a few ambiguous statements he made to Vides, none of which demonstrates that he believed he was in imminent danger from Hamilton. There was no evidence that Hamilton had a weapon or that anyone present believed he had a weapon. Given that Hamilton, a physically disabled man, retreated and begged for his life moments before appellant shot him in the chest, and that appellant returned to shoot Hamilton in the head at close range when he posed no threat to appellant, we conclude there is no reasonable probability that a jury instructed on imperfect self-defense would have found appellant guilty of manslaughter.

## B.     CALCRIM No. 301 Jury Instruction

Appellant asserts the trial court improperly instructed the jury with CALCRIM No. 301 because it stated that Bonilla's uncorroborated testimony would be insufficient prove *any* fact if Bonilla was found to be an accomplice, violating appellant's right to due process and a fair trial. He claims the error "prejudiced [him] because several aspects of Bonilla's testimony supported his defense theory." We review instructional error claims de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Appellant failed to raise this contention in the trial court, forfeiting the issue on appeal. Nevertheless, to forestall a later ineffectiveness of counsel claim and in the interest of judicial economy, we will address the issue.

17

(*People v. Norman* (2003) 109 Cal.App.4th 221, 230; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)  We conclude the claim lacks merit.

### i. *Applicable Legal Principles*

Section 1111 places a restriction on the use of accomplice testimony to convict a defendant.  "A conviction can not [*sic*] be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense."  (§ 1111.) The reason for this rule is that "an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts."  (*People v. Brown* (2003) 31 Cal.4th 518, 555.)  That concern is not present when the accomplice's testimony favors the defendant.  "Because an accomplice does not ordinarily stand to benefit from providing testimony on behalf of the defendant, his or her statements are not necessarily suspect."  (*People v. Guiuan* (1998) 18 Cal.4th 558, 567.)  Therefore, a cautionary instruction on accomplice testimony should only target testimony that tends to incriminate the defendant.  (*Id*. at p. 569.)

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony.  [Citation.] This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence."  (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.)  "Unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence, whether a witness is an accomplice is a question for the jury." (*People v. Williams* (2008) 43 Cal.4th 584, 636.)

18

### ii. The Jury Was Properly Instructed

The challenged jury instruction was a modified version of CALCRIM No. 301: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence. [¶] This particular rule does not apply to the testimony of an accomplice. Special rules apply to your consideration of the testimony of an accomplice. Please follow [CALCRIM No.] 334 above when considering whether Eduardo Bonilla is an accomplice, and if he is an accomplice, what considerations apply to his testimony."

CALCRIM No. 334, as modified, stated: "Before you may consider the testimony of Eduardo Bonilla *as evidence against* David Arce, you must decide whether Eduardo Bonilla was an accomplice. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant." (Italics added.) The instruction further defined an accomplice and then continued: "If you decide that Eduardo Bonilla was not an accomplice, then supporting evidence is not required and you should evaluate his testimony as you would that of any other witness. [¶] If you decide that Eduardo Bonilla was an accomplice, then you may not convict the defendant . . . based on Mr. Bonilla's testimony alone." The instruction concluded: "Any testimony of an accomplice *that tends to incriminate the defendant* should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that testimony the weight you think it deserves after examining it with care and caution and in light of all the other evidence." (Italics added.)

Appellant argues that some aspects of Bonilla's testimony were favorable to him, including testimony that appellant was not involved in the initial confrontation in the bar, that Hamilton had targeted Bonilla, and that

appellant would not have backed him up because Bonilla was no longer in good standing with appellant or the VSP gang. Appellant claims the instruction erroneously required corroboration of these exculpatory statements, relying on *People v. Smith* (2017) 12 Cal.App.5th 766 (*Smith*). That case is distinguishable.

In *Smith,* the trial court gave instructions similar to those here; however, the appellate court found the requirement for supporting evidence for accomplice testimony was flawed because it required corroboration even with respect to exculpatory testimony. (*Smith*, *supra*, 12 Cal.App.5th at p. 780.) Unlike the modified CALCRIM No. 301 given in the present case, the instruction in *Smith* told the jury that the testimony of "any . . . person you determine to be an accomplice . . . *requires* supporting evidence" (*Smith*, at p. 780, italics added) without specifying that this rule applied to incriminating testimony only. The appellate court found the instruction erroneous because it told the jury that all of an accomplice's testimony, including exculpatory testimony, required corroborating evidence before the jury could accept it as true. (*Ibid.*) The court found the error prejudicial because the need for corroboration became a point of disagreement during deliberations, and a holdout juror was dismissed in part because other jurors believed this juror was unwilling to follow the court's instruction. (*Id.* at p. 781.)

" ' " ' "Whether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court." ' " ' " (*People v. Hughes* (2002) 27 Cal.4th 287, 360.) Additionally, "[j]urors are presumed to be intelligent persons capable of understanding and correlating jury instructions. [Citation.] An erroneous instruction requires reversal only

20

when it appears that the error was likely to have misled the jury." (*People v. Brock* (2006) 143 Cal.App.4th 1266, 1277.)

In the present case, the jurors would have understood from the instruction that corroboration was only required for incriminating accomplice testimony. As the People note, the modified CALCRIM No. 334 instruction given here was specifically referenced in the modified CALCRIM No. 301, and "correctly advised the jury that the corroboration requirement for accomplice testimony only applied to evidence that was used 'against' and 'to convict' appellant." Nothing in the instruction suggested that the appellant was required to corroborate Bonilla's exculpatory testimony or that the jury should view such favorable testimony with caution. And, unlike *Smith,* there was no evidence of juror confusion over the corroboration requirement in the proceedings below.

Further, any presumed error was harmless because Bonilla's testimony did not include uncorroborated exculpatory evidence. Contrary to appellant's argument, Bonilla did not testify that appellant was uninvolved in the bar as the dispute unfolded. Nor did he testify that appellant was afraid of any specific individual in the bar. To the extent any of Bonilla's testimony could be construed as exculpatory, that testimony was corroborated by other evidence or was inconsequential. For example, the fact that appellant was not dressed in gang colors that night was corroborated by the surveillance video. Bonilla's testimony that Hamilton had challenged him, not appellant, made little difference in light of the substantial evidence that appellant was the actual shooter, including testimony by Vides and Perez and recovery of the firearm. Any error in instructing the jury as to the corroboration requirement for accomplice testimony was thus harmless. (*Watson, supra,* 46 Cal.2d 818, 837.)

21

## C.  Criminal Street Gang Special Circumstance Finding

In addition to finding appellant guilty of first degree murder, the jury found true the gang enhancement and gang special circumstance allegation. (§§ 186.22, subd. (b)(1), 190.2, subd. (a)(22).)  The gang special circumstance applies to a "defendant [who] intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was *carried out to further the activities of the criminal street gang*."  (§ 190.2, subd. (a)(22), italics added.)  Appellant contends the italicized language above is unconstitutionally vague and violates the Eighth Amendment of the federal Constitution because it is impossible to know what "activities" the statute is meant to reach.  The gang special circumstance provision therefore creates an arbitrary and capricious application of the death penalty by failing to narrow the class of death-eligible appellants.[5]  We disagree.

### i. *Applicable Legal Principles*

To comply with the Eighth Amendment, a state's capital punishment scheme must include an "objective basis for distinguishing" a capital case from a noncapital case.  (*People v. Crittenden* (1994) 9 Cal.4th 83, 154 (*Crittendon*); see *Godfrey v. Georgia* (1980) 446 U.S. 420, 433.)  "A legislative definition lacking 'some narrowing principle' to limit the class of persons eligible for the death penalty and having no objective basis for appellate review is deemed to be impermissibly vague under the Eighth Amendment." (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 465.)  The special circumstances contained in section 190.2, subdivision (a) perform the narrowing function,

---

[5] Appellant points out that this last phrase of section 190.2, subdivision (a)(22) has never been interpreted by a published opinion of an appellate court.

which limits the sentence of death or life without the possibility of parole to a small subclass of murderers. (*Crittenden,* at pp. 154–155.)

Section 190.2, subdivision (a)(22) applies to a defendant who is an "active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22," and who commits murder "to further the activities of the criminal street gang." It references section 186.22, an anti-gang statute that creates a substantive offense for "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang. " (§ 186.22, subd. (a); see *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130.) Section 186.22 also enhances the punishment for any felony that is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).)

Subdivision (e) of section 186.22 defines a " 'pattern of criminal gang activity' " as "the commission of, attempted commission of . . . or conviction of two or more" statutorily enumerated offenses. (§ 186.22, subd. (e); see *id.* at subd. (e)(1)-(33) [listing qualifying offenses]; *People v. Zermeno* (1999) 21 Cal.4th 927, 930 ["A gang engages in a 'pattern of criminal gang activity' when its members participate in 'two or more' statutorily enumerated criminal offenses (the so-called 'predicate offenses') that are committed within a certain time frame and 'on separate occasions, or by two or more persons.' "].) Murder is listed as one of those criminal activities. (§ 186.22, subd. (e)(3).) At the trial below, the People introduced evidence of three VSP gang-related offenses prior to the murder of Hamilton, including two

committed by appellant himself: the 2011 incident in San Rafael and the 2012 incident in San Francisco.

### ii. *The Challenged Statute is Not Unconstitutionally Vague*

Appellant acknowledges that the California Supreme Court has upheld the definition of "active participation" in a street gang as used in section 186.22, subdivision (a), against challenges for vagueness. (*People v. Castenada* (2000) 23 Cal.4th 743, 747–749. However, he contends that the gang special circumstance provision of section 190.2, subdivision (a)(22) is unconstitutionally vague because "it is unclear what it means to 'further the activities of [a] criminal street gang." Specifically, he claims it is unclear "whether the 'activities' of a gang include innocent as well as criminal conduct and what a defendant's state of mind must be in relation to the furtherance of those activities."

Section 190.2, subdivision (a)(22) "contains three basic elements: (1) the defendant must intentionally kill the victim; (2) while an active participant in a criminal street gang; (3) in order to further the activities of the gang." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 612.) Unlike appellant, we see no need to resort to the dictionary definition of "activity" to construe the special circumstance criminal gang allegation because its meaning is clarified and supplemented by its reference to section 186.22, subdivision (f).

Section 186.22, subdivision (f) defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang

24

activity." (§§ 186.22, subd. (f), 190.2, subd. (a)(22).)  As noted above, section 186.22, subdivision (e) defines a "pattern of criminal gang activity" as the commission of two or more of the 33 felonies listed in that subdivision.  This statutory definition does not encompass "innocent" street gang activity.  Rather, it describes a group of individuals who engage in a "pattern of criminal activity" by participating in specified criminal offenses enumerated in section 186.22, subdivision (e).

Thus, when a defendant who is an active participant of a criminal street gang commits murder to "further the activities of the criminal street gang," the "activities" contemplated by section 190.2, subdivision (a)(22) are the same activities that constitute the gang's pattern of criminal activity as described in section 186.22, subdivision (e).  Appellant's suggestion that the street gang special circumstance provision might include innocuous behavior makes no sense.  It is difficult to conceive of a situation where a defendant would commit murder to further an "innocent" gang purpose.  Murder is one of the listed predicate offenses (§ 186.22, subd. (e)(3)), and as the evidence at trial demonstrated, the commission of murder and other acts of violence furthers the activities of the criminal street gang by enhancing the gang's reputation for fear and intimidation and its willingness to defend its turf.[6]

---

[6] A defendant who commits murder while he or she is an active participant in a criminal street gang might nevertheless be ineligible for the gang special circumstance allegation if the murder is committed for some personal reason, and not "to further" the activities of the criminal street gang.  But that was manifestly not the case here.  Evidence was adduced that appellant was involved in the argument inside the bar in which VSP and North Richmond gang members confronted each other and demeaned the others' territory.  After the argument spilled outside, appellant shot the victim because the gang code requires retaliation against individuals who

Contrary to appellant's claim, section 190.2, subdivision (a)(22) narrows the class of persons eligible for the death penalty and life without the possibility of parole by requiring that the defendant be an active participant in a criminal street gang and that the murder be committed to further the criminal street gang's pattern of criminal behavior as described in section 186.22, subdivision (e). As one appellate court has noted, "[t]his language [of section 190.2, subdivision (a)(22)] substantially parallels the language of section 186.22, subdivision (b)(1), which authorizes a sentencing enhancement for felonies 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Carr* (2010) 190 Cal.App.4th 475, 488 (*Carr*).)

As the People point out, CALCRIM No. 736 is consistent with this interpretation of section 190.2, subdivision (a)(22). The instruction required the jury below to find four elements before it could find the gang special circumstance allegation true. The third element required a finding that the appellant "knew that members of the gang engage in or have engaged in a pattern of criminal gang activity." The fourth element of the instruction provided that "[t]he murder was carried out to further the activities of the criminal street gang." Read in context, the fourth element's reference to the "activities of the criminal street gang" refers back to the third element's description of "a pattern of criminal gang activity." Both phrases use the word "activity." Thus, the instruction required the jury to find that the murder of Hamilton furthered the gang's ability to commit the crimes enumerated in section 186.22, subdivision (e).

---

disrespect the gang's turf. And there was no evidence that appellant had any personal animus toward Hamilton.

26

Finally, appellant argues that the challenged phrase "does not articulate what the accused's state of mind must be with respect to the furtherance of gang activity." However, he concedes that "[e]ven though it is not explicitly mentioned, the specific intent to further gang activity is implicit." Appellant is correct. "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456–457.)

Implicit in the statutory language that a murder be "carried out to further the activities of the criminal street gang" (§ 190.2, subd. (a)(22)) is the requirement that the defendant specifically intended to further the activities of the criminal street gang. (See *Carr, supra,* 190 Cal.App.4th at p. 488, fn.13 [§ 190.2, subd. (a)(22) "does not require a defendant's subjective knowledge of particular crimes committed by gang members," but only guilty knowledge and intent of the gang's criminal purposes."].) Because appellant acknowledges that section 190.2, subdivision (a)(22) implicitly requires a finding that the defendant specifically intended to further the activities of the criminal street gang, and the defendant must be shown to have had knowledge of the gang's criminal purposes (*Carr*, at pp. 487–488), the gang special circumstance statute adequately defines the defendant's state of mind in furthering the gang's criminal activity. We conclude the statute is not impermissibly vague under the Eighth Amendment.

## D. Cumulative Error

Appellant argues the cumulative prejudicial effect of the trial court's errors requires reversal of his convictions. Reversal is not required as appellant has failed to demonstrate prejudice under either state law error (*Watson, supra,* 46 Cal.2d at p. 836) or federal constitutional error (*Chapman v. California* (1967) 386 U.S. 18, 24). Even assuming such errors occurred, those errors, as we have explained, were harmless.

## E. Sentencing for Possession of a Firearm by a Convicted Felon

Appellant contends his sentence for possession of a firearm by a convicted felon must be stayed under section 654 because the offense was part of an indivisible transaction with the murder conviction. We disagree, but agree with his alternative argument that the abstract of judgment must be corrected to reflect that his sentence is concurrent.

Section 654 provides, in relevant part, that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

The jury convicted appellant of being a felon in possession of a firearm under section 29800, subdivision (a)(1). The elements of this offense require conviction of a felony and ownership or knowing possession, custody, or control of a firearm. (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.) The offense is completed once the intent to possess is perfected by possession. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1146; § 29800, subd. (a)(1).) Where, as here, the evidence was uncontroverted that appellant arrived at the crime scene already in possession of the firearm he then used to commit another crime, the firearm possession was a separate and antecedent offense.

(Compare *Jones,* at pp. 1141, 1143–1145 with *People v. Bradford* (1976) 17 Cal.3d 8, 22 [appellant used gun wrested from police officer to shoot officer; § 654 applied].)  The evidence conclusively shows appellant already possessed the gun when he approached and shot Hamilton.  No " 'fortuitous circumstances' " put the firearm in appellant's hands at the moment the victim was killed.  (*Jones,* at p. 1144.)  Moreover, as the trial court noted, appellant retained possession of the weapon after the crime was committed in order to return it to Vides.  Thus, section 654 is inapplicable.

Appellant alternatively argues that the abstract of judgment should be corrected to reflect the trial court's imposition of a concurrent term for this conviction.  We agree.  During sentencing, the trial court expressly indicated that the firearm possession sentence was to run concurrently, and the People concede the abstract of judgment must be corrected to reflect the trial court's pronouncement.

## DISPOSITION

The abstract of judgment shall be amended to state that appellant's sentence on count 2 is to run concurrently with the sentence imposed on count 1.  The trial court shall forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.  As so modified, the judgment is affirmed.

                              _____

                              Sanchez, J.

WE CONCUR:


_____

Humes, P.J.


_____

Banke, J.

*A153460 People v. Arce*

30

Trial Court:       Contra Costa County Superior Court

Trial Judge:       Hon. Charles B. Burch

Counsel:

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant

Xavier Becerra, Attorney General, Jeffrey M. Laurence, Assistant Attorney General, René A Chacón and David M. Baskind, Deputy Attorneys General, for Plaintiff and Respondent